NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

BONNIE ENTERPRISES, INC.,
Respondent.

No. 9594.

United States Court of Appeals
Fourth Circuit.

Argued Jan. 7, 1965.

Decided Feb. 2, 1965.

Leonard M. Wagman, Attorney, N. L. R. B. (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Gary Green, Attorney, N. L. R. B., on brief), for petitioner, M. R. Broudy, Norfolk, Va. (Broudy & Broudy, Norfolk, Va., on brief), for respondent.

Before SOBELOFF and BRYAN, Circuit Judges, and HUTCHESON, District Judge.

HUTCHESON, District Judge.

The National Labor Relations Board (hereinafter called the Board) seeks enforcement of an order entered by it on February 11, 1964 requiring the respondent, Bonnie Enterprises, Inc., to recognize Local 305, Amalgamated Meat Cutters & Butcher Workmen of North America, AFL–CIO (hereinafter called the Union) as the exclusive bargaining representative of all its meat department employees at the retail stores of Respondent located in Virginia, as the result of an election held by the Board on February 14, 1963.

Respondent filed timely objections to the conduct of the election and the order here involved was entered adverse to Respondent's contentions.

The controversy involves two issues: (1) Whether the campaign literature issued by the Union warranted setting aside the election; and (2) whether the ballots of certain voters should not be counted because of the asserted supervisory status of those voters.

*The Campaign Literature.* On election day and on the preceding day the Union distributed to employees a circular which reads as follows:

HANDBILL #2

The provisions listed below are the Union's program and are in all Meat Cutters contracts in this and other areas.

1. Vacation:

    1 week after one year's service

    2 weeks after three years' service

    3 weeks after ten years' service

    4 weeks after twenty years' service

2. Six paid holidays:

New Year's Day — Memorial Day
Fourth of July — Labor Day
Thanskgiving Day — Christmas Day

3. Group Life Insurance for the employee and his family as well as Sick Pay for time lost for sickness.

4. Pension Plan.

5. Time and one-half (1½) pay for all hours over forty (40) hours in any week.

6. Time and one-half (1½) pay for all hours worked on a holiday plus the holiday pay.

7. Time and one-half (1½) for all hours worked on Sundays.

8. A grievance procedure, which means that the Company cannot push you around to suit themselves.

9. Two (2) fifteen (15) minute paid coffee breaks each day.

10. Seniority:

Which means that the Company cannot shove you all over the map to suit themselves.

11. All uniforms are furnished and laundered by the Company.

12. Leaves of Absence for pregnancy, personal reasons, union business and death in the family without loss of seniority.

### AND

ONE OF THE MOST IMPORTANT PROVISIONS IN ALL MEAT CUTTERS CONTRACTS:

"NO EMPLOYEE SHALL SUFFER A REDUCTION IN WAGES OR THE LOSS OF ANY OTHER BENEFITS DUE TO HAVING A UNION."

A YES VOTE AT THE SECRET BALLOT ELECTION ON FEBRUARY 14th WILL BE THE FIRST STEP IN SECURING THESE CONDITIONS AND BENEFITS IN YOUR STORES, AND FOR A BETTER WAY OF LIFE FOR YOU AND YOUR FAMILY.

NO ONE BUT NO ONE WILL KNOW HOW ANYONE VOTES UNLESS THE EMPLOYEE HIMSELF TELLS.

FULL DETAILS ON WAGE RATES WILL BE GIVEN AT A LATER DATE.

Respondent contends that the circular so distributed contained willful and substantial mis-statements of fact designed and calculated to affect the results of the election.

It subsequently developed that the benefits as listed in the circular are not in all of the Union's contracts in this and other areas. The Union's contract with Colonial Stores contained all the claimed benefits but the Giant Food contract did not contain the provisions for a 4th week of vacation, a pension plan, sick benefits, group life insurance for the employee and his family, nor two fifteen minute coffee breaks each day. The Union had two Richmond contracts in which were lacking the following benefits: Group life insurance for the employee and his family; pension plan; time and one half for all hours worked on holiday plus holiday pay; time and one half for time worked on Sunday and two fifteen minute paid coffee breaks each day. There were two other contracts in effect neither of which provides for a pension plan; one has no provision for 3rd or 4th week vacations, group life insurance for the employee and his family, nor sick pay for time lost.

It is contended in behalf of the Board that the circular is not a material misrepresentation but is merely an exaggeration which the Board, while not condoning, has left for the voter to evaluate, although the Board concedes that it is "not completely correct". In its brief, it is contended that the circular did not substantially distort the basic fact which the Union sought to communicate, that is, it had obtained for other employees the listed contract benefits and that in general it could not reasonably be expected to have a significant impact on the election, being only a "minor distortion" of some facts. It then undertakes to compare these statements with the extravagant promises so often made by and in behalf of candidates for public office, with which we are so familiar.

A consideration of the benefits which the Union stated *"are in all meat cutter's contracts in this and other areas"* (emphasis here supplied) but which do not appear in many contracts, reveals that they are of the highest importance. The circular, cleverly worded, purports to be an assertation of existing facts carrying an implicit promise to obtain similar benefits for employees if the Union is accepted as their bargaining representative.

Certainly, in this day of unceasing search for security, promises of group life insurance for the employee and his family and sick pay for time lost for sickness are of no minor consideration. While it is true that Social Security is available to employees, it does not take the place of a pension plan.

While the 4th week vacation after 20 years' service may be considered a relatively minor fringe benefit, two fifteen minute paid coffee breaks are of daily interest.

While the Wage and Hour Laws are rather comprehensive, the time and one half pay periods promised in the circular can not be lightly dismissed.

We find no support for the Board's assertion that "Respondent concedes that the Union's statements were generally accurate and justified with respect to the content of area contracts". We find no such concession in the record nor was counsel able to help us in this respect.

■ It is clear that the promises contained in the circular went far beyond the bounds of permissible hyperbole sometimes indulged in during pre-election campaigns for public office. They were substantial misrepresentations of material facts of vital concern to employees voting in the election. In fact, it is difficult to conceive of more important misrepresentations. Furthermore, the timing of the publication afforded no opportunity for the interested parties to either verify the claims or to determine their untruthfulness.

■ While we recognize the considerable discretion with which the Board has been entrusted, it is proper to observe that with discretion goes responsibility.

A comparison of decided cases as applied to the facts appearing here would serve no useful purpose and would only unduly prolong this discussion.

It follows that the enforcement of the order of the Board should be denied, because of the impropriety of this piece of campaign literature which was sufficient to mislead the electorate when casting their votes.

■ *The Status of the Assistant Managers*—Section 2(11) of the Act defines the term "supervisor" as:

"Any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibility to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment".

Respondent operated meat departments in its retail food markets in Virginia at 16 locations. Those departments vary in size from 3 to 12 employees including the meat manager and assistant meat manager. The pay of the assistant managers is from 85% to 120% greater than that of the rank and file employees working under them and amounts to approximately 85% of the salary of the meat manager. The assistant manager is in charge of the meat department in the absence of the manager. At times the work schedule for rank and file employees is prepared by the assistant manager which requires the consideration of the needs of the business, statutory limitations as to hours and employee preferences. He assists less experienced employees in cutting meat, arranging displays and waiting on customers. The analysis of the normal weekly schedules for the months of January and Febru-

ary, 1963 appearing on page 26 of the Joint Appendix, reveals that during that period the weekly time during which assistant managers were present in the absence of the managers varied from 2 hours to one and one half days except in one instance when no such time was spent. The number of employees present with the assistant managers varied from 1 to 8. That analysis does not include lunch time when the manager was not present. In the absence of the manager, the assistant manager exercised supervisory powers including allowing time off, suspending employees, the exercise of independent judgment in cutting and pricing meat, the assignment of work to employees, and in the recommendation for hiring and, with the manager, evaluation for wage increases. During all absences of the manager, such as vacations, illness, one day each week, one hour for lunch each day and on alternating nights, the assistant manager is in full charge. The assistant managers attended management meetings where policies were determined. In general, the assistants were trainees to become managers. Accordingly, their interests were consistent with the interests of management, they already having been promoted and selected for further promotion.

From the foregoing, shown by the far greater weight of proof and without substantial denial, it clearly appears that the assistant meat managers fall within the definition of the term "supervisor".

At the election, the status of the assistant managers was an issue and although we have concluded, on other grounds, that enforcement of the Board's order should be denied, we deem it proper to clarify the status of the assistant meat managers in view of the possibility that another election may be called.

The enforcement of the order is

Denied.