**GRAPHIC ARTS FINISHING CO., Inc.,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 10159.

United States Court of Appeals
Fourth Circuit.

Argued Feb. 9, 1966.

Decided June 19, 1967.

Leonard E. Cohen and Joseph Bernstein, Baltimore, Md. (Erwin Ira Ulman, Baltimore, Md., on brief), for petitioner.

Glen M. Bendixsen, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Wayne S. Bishop, Atty., N. L. R. B., on brief), for respondent.

Before BOREMAN, BRYAN and J. SPENCER BELL,* Circuit Judges.

BOREMAN, Circuit Judge:

This is a petition by Graphic Arts Finishing Co., Inc. (hereafter the company), for review of a decision of the National Labor Relations Board (hereafter the Board) which held that the company had violated section 8(a) (5) of the National Labor Relations Act as amended.

---

* Judge Bell, a member of the panel, voted in conference for enforcement of the Board's order but died before the opinion was prepared.

The Board's Decision and Order is reported at 153 NLRB No. 115.

The company, a Maryland corporation, is engaged in finishing printed material, and has its principal place of business in Baltimore. In September of 1964 the United Papermakers and Paperworkers, AFL–CIO (hereafter the union), engaged in an organizing campaign at the company plant. On September 22, 1964, the Board conducted a representation election at the company plant. There were ninety-one votes cast for the union and eighty-three against, with five challenged votes. The company filed objections with the Regional Director urging that the election was rendered invalid by reason of unfair conduct on the part of the union and should be set aside. The Regional Director, after an investigation but without a hearing, recommended that the company's objections be overruled and that the union be certified. The company filed objections with the Board and again requested a hearing. The Board, without a hearing, adopted the Regional Director's recommendations and certified the union as the bargaining representative of company employees. However, the company refused to bargain with the union, asserting that it would not do so until a federal court had reviewed the Board's certification. The union then filed an unfair labor practice charge based upon the company's refusal to bargain. The parties stipulated to waive a hearing before a Trial Examiner and the matter proceeded directly to the Board. The Board held that the company had violated section 8(a) (5) of the Act by refusing to bargain collectively with the union and ordered the company to cease and desist from such practice.

The company argues that the pre-election conduct and tactics of the union rendered the election unfair and interfered with the free choice of the employees.

We consider and discuss here only one aspect of the challenged conduct which, in our opinion, requires that enforcement of the order under review be denied.[1]

It is undisputed that twenty-four hours prior to the election the union issued two circulars which undertook to point out to the employees the many benefits which would follow unionization. One circular related to "wage rates and fringe benefits that are being paid under Union Contracts," and proceeded to list wage rates for various classifications, but the companies allegedly paying such rates were not identified. It was subsequently established that the rates and benefits were a composite of those paid under various contracts in a wide area extending from Philadelphia, Pennsylvania, to Washington, D. C., excluding the Baltimore area. A witness familiar with the wage rates and benefits existing in unionized binderies in the Baltimore area submitted a statement that none of the companies in that area was paying the rates and benefits listed in the circular.

The apprentice rate set forth in the leaflet was 10% or $.33 per hour higher than that actually paid even in the Washington area where a high apprentice rate did exist.

A second circular distributed at the same time discussed strike procedure and strike benefits. With respect to strike relief benefits the leaflet stated "100,000 Dollars was paid out in strike relief to members and their families in the Chesapeake strike. NOT ONE PERSON LOST A THING." The strike referred to in the circular was a strike sanctioned and conducted by the same union at Chesapeake Paperboard Company, a Baltimore firm, from August 1962 to February 1963. The president of that company submitted a statement to the Re-

1. Among other company objections to the election were the following: coercion of employees and threats of violence on the part of union representatives and sympathizers; union violation of agreement not to challenge the votes of certain employees which agreement was a condition precedent to the company's consent to the election; the late start of the election which deterred employees from voting.

gional Director in which it was shown that his employees lost "approximately $600,000" in wages as a result of that strike. This strike was of great importance in the election which is challenged here because the same union was involved.

The Regional Director found that the circular contained such misstatements but that they were not sufficient to render the election invalid because their impact on the election was insubstantial. The misrepresentation as to apprentice rates was dismissed as insignificant because the company did not have an apprentice program and that trainees did not consider themselves apprentices. The Regional Director found no obligation on the part of the union to disclose that its information referred to a wholly different area. It concluded that the union was merely stating what it could do and "the fact that the prevailing unionized industry rates and benefits in Baltimore are less, does not mean it misrepresented or deceived the voters."

The Regional Director also dismissed the misstatement concerning the strike relief benefits paid at the Chesapeake Paperboard Plant because "this is the sort of language that employees can readily evaluate. It is unreasonable to suppose that employees would be misled by such statements into thinking that whether they strike or work, they will suffer no loss whatsoever. The facts of industrial life are too widespread. One can readily see through such exaggeration." These findings were adopted by the Board in its decision that the company had violated section 8(a) (5) of the Act; the Board merely referred to its earlier decision. With this decision we cannot agree.

The Board, in Hollywood Ceramics Company, Inc., 140 NLRB 221, formulated and announced the test to be applied in determining whether campaign literature containing misrepresentations could serve as a basis for invalidating an election. There the Board held that, in order to set aside an election, there must be (1) a misrepresentation of a material fact which is a substantial departure from the truth, (2) which is so timed as to prevent the other side from making an effective rebuttal, and (3) may reasonably be expected to have a significant impact on the election. Id. at 224.

In N. L. R. B. v. Bonnie Enterprises, Inc., 341 F.2d 712 (4 Cir. 1965), this court set aside an election because of union misrepresentation of facts contained in campaign literature. There the literature contained misrepresentations as to group life insurance, sick pay, vacations and coffee breaks. It was distributed on the day prior to the election and on election day. We held:

"It is clear that the promises contained in the circular went far beyond the bounds of permissible hyperbole sometimes indulged in during pre-election campaigns for public office. They were substantial misrepresentations of material facts of vital concern to employees voting in the election. In fact, it is difficult to conceive of more important misrepresentations. Furthermore, the timing of the publication afforded no opportunity for the interested parties to either verify the claims or to determine their untruthfulness." Id. at 714.

In Celanese Corporation of America v. N. L. R. B.,[2] it was held that misrepresentations as to fringe benefits were material to voting employees and would operate to set aside the election. The union had stated that fringe benefits at other company plants had been won through collective bargaining. While the court found that a number of benefits at the company's other plant were effected through collective bargaining, the company had instituted some benefits on its own initiative. The union argument that it did not intend to create the im-

2. 121 N.L.R.B. 303 (1958), enforcement denied, 279 F.2d 204 (7 Cir. 1960), vacated per curiam, 365 U.S. 297, 81 S.Ct. 689, 5 L.Ed.2d 688 (1961), enforcement denied, 291 F.2d 224 (7 Cir.), cert. denied, 368 U.S. 925, 82 S.Ct. 360, 7 L.Ed. 2d 189 (1961).

pression that all the benefits were won through collective bargaining was rejected by the court which stated: "If the author had intended to speak of some or several benefits, he would necessarily have had to employ a limiting adjective." 279 F.2d 206. The court, in a subsequent decision, pointed out that because of the union's special knowledge as to the facts and because the company was effectively prevented from replying to these misstatements the election would be set aside. 291 F.2d 226. Accord, N. L. R. B. v. Houston Chronicle Publishing Company, 300 F.2d 273 (5 Cir. 1962).

■ In the instant case there was no opportunity to reply to the union's misstatements and the election was close; a switch of only five votes would have resulted in a union defeat. The misrepresentations concerned subjects even more vital than those in *Bonnie Enterprises* because here they dealt, in part, with wages. A misrepresentation of $.33 an hour with respect to apprentices' wages represents $13.00 per week and more than $600.00 per year. It appears beyond question that such a figure is material and would significantly affect the free choice of the employees. See Bok Regulating NLRA Election Tactics, 78 Harv.L.Rev. 38, 90 (1964). The Regional Director's attempt to explain that the company had no apprentice system ignores the fact that the company had twelve trainees. It is also clear that no union employees in the area were receiving all the rates and benefits listed in the literature. The union, in discussing such significant subjects, was obligated to be much more precise. Wages are of paramount importance to employees as "they are the stuff of life for Unions and members, the selfsame subjects concerning which men organize and elect their representatives to bargain." N. L. R. B. v. Houston Chronicle Publishing Company, supra, 300 F.2d at 280.

■ We conclude that the gross misrepresentation as to strike benefits paid to the union's members at another plant in the area and that not one person lost a thing during a recent strike was material and had a significant impact on the election. There was no equivocation here: the union statement concerning what it had paid other members and the effect of such payments was unqualifiedly false. The Regional Director's explanation that the workers could easily see through such a misstatement disregards the fact that this was a statement made by the union which paid the strike benefits, a fact which would seem to clothe the statement with unmistakable authenticity. If the employees believed this statement, made by the party in the best position to know the truth, any doubts they entertained about joining the union for fear of being involved in a costly strike would be substantially reduced, if not totally removed. It is common knowledge that strikes play a major role in labor relations and that they constitute the most potent weapon in the employees' arsenal. We reach the conclusion that such deliberate misrepresentations as to material facts, particularly the false statement that the payment by the union of strike relief funds saved the strikers from all loss, made to employees who were faced with a difficult choice in an election decided by such a narrow margin, were timed so as to prevent the company from making an effective rebuttal, were reasonably expected to have a significant impact on the election and prevented the employees from registering their free and untrammeled choice as to a bargaining representative. N. L. R. B. v. Trinity Steel Co., 214 F.2d 120, 123 (5 Cir. 1954).

We hold that the Board's order should be set aside and the company's petition for denial of enforcement should be granted.

Enforcement denied.