J. I. CASE CO., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 76–1183.

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 14, 1976.

Decided May 18, 1977.

---

George J. Matkov, Jr., Chicago, Ill., for petitioner; James J. Salzman, Kathleen K. Intini, Chicago, Ill., Thomas M. Hanna, St. Louis, Mo., on the brief.

David F. Zorensky, N. L. R. B., Washington, D. C., for respondent; John S. Irving, Jr., Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Michael S. Winer, Atty., N. L. R. B., Washington, D. C., on the brief.

Before STEPHENSON, WEBSTER and HENLEY, Circuit Judges.

WEBSTER, Circuit Judge.

This Labor Board proceeding arises from a consent election conducted at the Rock Island, Illinois, manufacturing facility of petitioner J. I. Case Company. Employees in two voting groups at the plant voted in favor of the United Auto Workers as their bargaining representative. The company filed objections to the election. After conducting a hearing on the objections, a hearing officer found them to be without merit. The Board upheld the hearing officer's Report and Recommendation, and certified the union as bargaining representative. The company continued in its refusal to bargain with the union, and the Board, in summary proceedings, found the employer in violation of §§ 8(a)(1) and 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158, for refusing to bargain with the union. The company petitions to set aside the Board's bargaining order, and the Board cross-applies for enforcement.

The company makes numerous challenges to the election proceedings, but we are concerned principally with only one: the assertion that the proceedings were irreparably tainted by improper material misrepresentations on the part of the union.[1]

The election was conducted on December 18, 1974, in four separate voting groups at the plant. In Voting Group B, consisting of plant clerical employees, the employees chose the union by a 14–6 vote. In Voting Group D, office clerical employees, the employees chose the union by a vote of 33–19. In two other voting units the employees voted against the union.

For some time prior to the election, UAW Local 806 had represented production and maintenance employees at the plant. On the morning of December 17, 1974, the day before the election, Local 806 distributed a letter addressed to the office, professional, and technical employees who would vote in the election. The letter directed the employees' attention to a number of gains the union had achieved on behalf of the production and maintenance employees. Particularly, the letter claimed (1) that while the company took away cost-of-living increases from the employees, the union-represented employees had received $0.35 per hour in cost-of-living increases; (2) that the average piecework rate in the plant was about $8.00 per hour and that some production workers earned above $8.00 per hour; (3) that "[t]he yearly wage of skilled workers exceeds $19,000.00 and goes up to $20,000.00 and more;" and (4) that UAW employees had won other benefits, including "95% of wages plus paid insurance in the event of layoff * * *."

Shortly after the election, the company filed with the Board objections to the conduct of the election, charging particularly that the statements set out above materially misrepresented the facts and affected the outcome of the election. A Board hearing officer examined the statements and found that none so substantially misrepresented the facts as to warrant setting the election aside. A certification order was entered. On the company's refusal to bargain, the Board entered the bargaining order which the company now seeks to set aside, and which the Board seeks to enforce.

We have carefully reviewed the record in this case and conclude that the Board is not entitled to enforcement of its bargaining order; the union was guilty of substantial

---

1. In this Court, the company preserves these objections to the election, in addition to claims of misrepresentation by the union:

   (1) That union agents made coercive threats prior to the election;

   (2) That the union's waiver of initiation fees of those signing union authorization cards was an unlawful coercive inducement;

   (3) That union literature distributed to members of the bargaining unit made improper use of Board documents, implying government support of union efforts;

   (4) That a managerial employee improperly influenced and coerced eligible voters in behalf of the union; and

   (5) That the Board considered the objections in isolation and failed to consider the totality of the conduct complained of.

   In view of our holding on the issue of misrepresentation, it is unnecessary to consider the company's additional contentions.

misrepresentation of material facts on the eve of the election under circumstances which convince us that a significant impact on the election was very likely.[2]

■ The representations challenged in this case go to what is perhaps the most crucial issue of any organization effort: whether the company is paying the bargaining unit employees as much as it would if the employees were represented by the union. *See LaCrescent Constant Care Center v. N.L.R.B.,* 510 F.2d 1319, 1322 (8th Cir. 1975); *Thiem Industries, Inc. v. N.L.R.B.,* 489 F.2d 788, 792 (9th Cir. 1973); *N.L.R.B. v. Millard Metal Service Center, Inc.,* 472 F.2d 647, 650 (1st Cir. 1973); *N.L.R.B. v. Producers Cooperative Association,* 457 F.2d 1121, 1127 (10th Cir. 1972); *Gallenkamp Stores Co. v. N.L.R.B.,* 402 F.2d 525, 535 (9th Cir. 1968); *Graphic Arts Finishing Co. v. N.L.R.B.,* 380 F.2d 893 (4th Cir. 1967). While we make due allowance for some degree of "puffing" which any election contest engenders, *see N.L.R.B. v. Target Stores, Inc.,* 547 F.2d 421 at 424 (8th Cir., 1977); *LaCrescent Constant Care Center v. N.L.R.B., supra,* 510 F.2d at 1322; *Henderson Trumbull Supply Corp. v. N.L.R.B.,* 501 F.2d 1224, 1228 (2d Cir. 1974), we do not take the same view with respect to factual assertions made by either party to the contest. Promises are often written on the wind, but statements of fact are the stuff upon which men and women make serious value judgments. In the context of an election, rank and file employees must largely depend upon the company and the union to provide the data on which the arguments pro and con are based. If either side departs substantially from the truth, that side must accept the consequences if the misrepresentation, whether or not intended, could reasonably be expected to affect significantly the outcome of the election.

*Principal Misrepresentations*

Two of the statements contained in the union's December 17 letter are substantial departures from the truth.

■ (1) *Skilled worker wages.* In describing "[w]age increases we have won for our membership to date * * *" the December 17 letter stated, "The yearly wage of skilled workers exceeds $19,000.00 and goes up to $20,000.00 and more." The hearing officer held that this statement was not a material misrepresentation because "the yearly wage of skilled workers exceeds $19,-000.00 and some skilled employees earn up to $20,000.00." The evidence discloses that in 1974 only 8 of the 51 skilled workers were earning at least $19,000.00 and only one was earning in excess of $20,000.00. The average wage[3] of skilled workers in 1974 was $16,570.12. We do not think this significant disparity can be excused as mere exaggeration or explained away as a vague or ambiguous statement. The clear import of the message was that most, if not all, skilled workers were earning above $19,000. That 8 employees of 51 in the category were earning at that level is not even closely related to the expectation which the misrepresentation was almost certain to engender. We are concerned with the *effect* of such a misrepresentation upon the ability of the employee to make a free and informed choice of his representative. The Board's finding, here a mere adoption of the hearing officer's report, was not supported by substantial evidence.

(2) *Fringe benefits.* The union's December 17 letter also contained this statement:

In addition to wages, UAW Case workers have won many other benefits; such as

---

2. In *Hollywood Ceramics Co.,* 140 N.L.R.B. 221, 224 (1962), the Board announced this policy:

We believe that an election should be set aside only where there has been a misrepresentation or other similar campaign trickery, which involves a substantial departure from the truth, at a time which prevents the other party or parties from making an effective reply, so that the misrepresentation, whether deliberate or not, may reasonably be expected to have a significant impact on the election. [Footnote omitted.]

3. Including wages, overtime premiums, shift premiums and all pay for time not worked, such as casual days, vacations, holidays and bereavements.

95% of wages plus paid insurance in the event of lay-off, pre-paid Dental & Prescription Drug Plans, improved Life, Hospital, Medical and Surgical Plans, improved vacations, vacation bonus, additional paid holidays, paid Christmas week shutdown and many other benefits too numerous to mention here.

The company contends that this statement is false in that the employees were entitled only to 95% of net wages, rather than gross wages, in the event of lay-off, and that the lay-off benefit plan would not take full effect until 1975. The hearing officer found that, "The fact that the message is so inarticulately or vaguely asserted that it could be subject to differing interpretations will not suffice to set aside an election."

■ The difference between a percentage of wages based upon *gross* wages and one based upon *net* wages may be substantial. Moreover, the negotiated plan had a maximum weekly benefit of $100.00, a significant limitation on the dollar amount required to be paid for lay-off benefits. Misrepresentations about fringe benefits have formed the basis for refusals to enforce Board orders to bargain. *See N.L.R.B. v. Bonnie Enterprises, Inc.,* 341 F.2d 712, 714 (4th Cir. 1965); *Celanese Corp. of America v. N.L.R.B.,* 291 F.2d 224, 226 (7th Cir.), *cert. denied,* 368 U.S. 925, 82 S.Ct. 360, 7 L.Ed.2d 189 (1961); *Allis-Chalmers Mfg. Co. v. N.L.R.B.,* 261 F.2d 613, 616 (7th Cir. 1958). To discount the impact of such misrepresentations by characterizing them as "inarticulate" is to ignore the responsibility which goes with Board discretion. *See N.L.R.B. v. Bonnie Enterprises, Inc., supra,* 341 F.2d at 714.[4]

## Other Misrepresentations

The December 17 letter claimed that the company "took away cost-of-living wage increases from you," when in fact the salaried employees received three special (but nonmandatory) salary adjustments between 1971 and 1974, amounting to $0.21, $0.34 and $0.31 respectively. The letter represented that, based on cost-of-living increases received by UAW members in the plant, the salaried workers had lost $0.98 per hour (or about $2,000.00 per year), an hourly figure which includes $0.15 per hour that was a nonnegotiated float from the previous year. A similar technical misstatement occurred with reference to a union claim that $0.35 per hour in cost-of-living increases had been negotiated in the first six months of the contract. The hearing officer also found, while discounting its materiality, that a statement in the December 17 letter that pieceworkers were averaging $8.00 per hour was incorrect; the correct figure was approximately $7.00 per hour. Since pieceworker earnings are not as clearly related to salaried employees as are skilled workers' earnings, the gravity of this misrepresentation is not so clear.

■ These additional misrepresentations, all contained in the same letter, are perhaps not in themselves significant enough to warrant setting the election aside. They need not be ignored, however, because they are part of the totality of the circumstances and give added weight to our conclusion that in these circumstances the misrepresentations with respect to skilled worker earnings and fringe benefits must have had a significant impact upon the election.

## Opportunity to Reply

The Board adopted the hearing officer's finding that the company had a sufficient opportunity to reply to these misrepresentations. The Board's policy of excusing gross misrepresentations because the other party might have been able to set the record straight has been seriously questioned. As the Third Circuit said in *Aircraft Radio*

---

4. The company asks, perhaps with tongue in cheek, whether the Board can properly read "after taxes" into the union's fringe benefit statement but not into the claim of $19,000 for skilled workers. This does point up a measure of artful dodging which commands little deference on our part.

*Corp. v. N.L.R.B.,* 519 F.2d 590, 593 (3d Cir. 1975),

Fairness is not readily apparent when a party which has been successful in the balloting through the use of deliberate falsehood is allowed to retain its victory by pleading that its opponent had opportunity for rebuttal.

In any event, the company in this case had no opportunity to set the record straight. The claims of the union were largely based upon calculations using figures derived from other unidentified records. Any reply would necessarily have required careful preparation. The union's letter was first circulated the day before the election. In our view, there was insufficient opportunity for a meaningful reply. *See N.L.R.B. v. Georgia-Pacific Corp.,* 473 F.2d 206, 208 (8th Cir. 1973); *Thiem Industries, Inc. v. N.L.R.B.,* 489 F.2d 788, 792 (9th Cir. 1973); *N.L.R.B. v. Millard Metal Service Center, Inc.,* 472 F.2d 647, 650 (1st Cir. 1973).

While considerable deference should be accorded to the Board's findings in these cases, this Court nonetheless has the responsibility for assuring that the Board keeps within reasonable grounds. *Universal Camera Corp. v. N.L.R.B.,* 340 U.S. 474, 490, 71 S.Ct. 456, 95 L.Ed. 456 (1951). We think the company has met its heavy burden in this case. *See N.L.R.B. v. Griffith Oldsmobile, Inc.,* 455 F.2d 867, 871 (8th Cir. 1972). Upon full consideration of the record and for the reasons stated above, we grant review and deny the Board's cross-petition for enforcement.