BEAIRD–POULAN DIVISION, EMER-
SON ELECTRIC COMPANY,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 80–1142.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 16, 1980.

Decided May 21, 1981.

D. Michael Linihan, McMahon, Berger, Breckenridge, Hanna, Linihan & Cody, St. Louis, Attys. for petitioner, Beaird-Poulan Division, Emerson Elec. Co.

John G. Elligers, J. Keith Gorham, Attys., National Labor Relations Board, Wash-

ington, D. C., William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, National Labor Relations Board, Washington, D. C., for respondent.

Before BRIGHT and McMILLIAN, Circuit Judges, and RENNER,* District Judge.

McMILLIAN, Circuit Judge.

The Beaird-Poulan Division of Emerson Electric Company (the Company) petitions this court to review and set aside the supplemental decision and order[1] of the National Labor Relations Board (the Board) issued on February 25, 1980. The Board had overruled the Company's objections to the representation election and found that the Company violated § 8(a)(5) and (1) of the National Labor Relations Act (the Act), 29 U.S.C. § 151 *et seq.*, by refusing to bargain with the United Auto Workers Union (the Union), as the duly certified representative of the Company's employees. The Board cross-petitions, pursuant to § 10(e) of the Act, for enforcement of its order. For the reasons discussed below, the Company's petition to set aside is denied and the Board's order is enforced in full.

The Company, a Missouri corporation, has two plants for the manufacture of chain saws in Shreveport, Louisiana. In mid-February of 1976, the Union began its organizational campaign at these two plants. The Company actively opposed the Union's organizational campaign. All participants agree that the campaign was intense and vigorous.

On April 30, 1976, pursuant to a stipulation for certification upon consent election, the Board conducted a secret ballot election. The tally showed that 402 ballots were cast for the Union, 383 ballots were cast against the Union, and 10 ballots were challenged. On May 19, the Union requested the Company to recognize and bargain collectively with it. Since that date, the Company has continued to refuse such requests.

The Company filed timely objections to the election. After investigating these objections and considering the evidence submitted by the Company, the Regional Director made credibility resolutions adverse to the Company. He recommended to the Board that each Company objection be overruled and that the Union be certified as the bargaining representative. The Company filed timely objections to the Regional Director's report. The Company asked the Board to review and set aside the election or, in the alternative, to order a hearing to resolve the factual issues. On November 23, 1976, the Board rejected the Company's request for a hearing, overruled the objections, and certified the Union as exclusive bargaining representative.

On December 13, 1976, the Union filed an unfair labor practice charge with the Board. The Board's General Counsel issued a complaint alleging that the Company's refusal to bargain with the Union violated § 8(a)(5) and (1) of the Act. The Company admitted its refusal to bargain but contended that it had no duty to bargain because the Board improperly certified the Union. Thereafter, on May 25, 1977, the Board granted the General Counsel's motion for summary judgment. The Board also held that the Company had failed to raise substantial or material issues which would warrant an evidentiary hearing.

The Company then petitioned this court for review. On March 2, 1978, the Board's cross-application for enforcement was denied and the case was remanded for a hearing on the alleged misconduct in the representation election. The salient language in that opinion was the following: "Although we make no factual findings with regard to the alleged misconduct, we do find that the company presented specific allegations of misconduct sufficient to set aside the election, if true, and is entitled to an evidentiary hearing." *Beaird-Poulan Division, Em-*

* The Honorable Robert G. Renner, United States District Judge for the District of Minnesota, sitting by designation.

1. 247 N.L.R.B. No. 180, 103 L.R.R.M. 1389 (1980).

*erson Electric Co. v. NLRB,* 571 F.2d 432, 434 (8th Cir. 1978).

After nine days of hearings, the administrative law judge (ALJ) recommended to the Board that the Company's objections be overruled. On February 25, 1980, the Board adopted the findings and recommendations of the ALJ, affirming the Union's certification and finding that the Company violated § 8(a)(5) and (1) of the Act by refusing to bargain. Because of that decision, the Company once again filed a petition for review in this court.

██ It is axiomatic that representation elections are not to be set aside lightly. The burden of showing grounds for doing so is on the party seeking to overturn the election. And that burden is a heavy one, requiring the objecting party to show by specific evidence not only that improprieties occurred, but also that they interfered with employees' exercise of free choice to such an extent that they materially affected the election results. *NLRB v. Mattison Machine Works,* 365 U.S. 123, 124, 81 S.Ct. 434, 435, 5 L.Ed.2d 455 (1961); *NLRB v. Griffith Oldsmobile, Inc.,* 455 F.2d 867, 871 (8th Cir. 1972).

## I. *The Coercive Incidents*

The Company argues that the Board's decision overruling its objections to the election is not supported by substantial evidence. It contends that the Union conducted a campaign of fear and intimidation, including predictions of violence and economic detriment to employees opposed to the Union, which permeated the entire atmosphere thereby destroying the laboratory conditions required by the Board in its election proceedings.

██ For review of the Board's decision, the standard is whether the Board acted within the "wide degree of discretion" vested in it by Congress regarding representa-

tion matters. *NLRB v. A.J. Tower Co.,* 329 U.S. 324, 330–31, 67 S.Ct. 324, 327–328, 91 L.Ed. 322 (1946); *Macy's Missouri-Kansas Division v. NLRB,* 389 F.2d 835, 842 (8th Cir. 1968). "[T]he Court is bound by the fact-finder's assessment of 'credibility of witnesses and the weight to be given their testimony,' unless such assessment is 'shocking to [its] conscience.'" *Keokuk Gas Service Co. v. NLRB,* 580 F.2d 328, 334 (8th Cir. 1978). We look first, therefore, to the credibility determinations made by the ALJ.

The ALJ's Supplemental Decision set forth exhaustively the testimony of each witness. Regarding each of the over twenty instances of alleged misconduct, he detailed the conflicts between different witnesses' versions of the event, the internal inconsistencies in a single witness' version, or the other factors[2] that entered into his determination. Significantly, in discussing the first incident, he stated:

As has appeared and will appear throughout this Decision, I have been unable to credit in full the testimony of any of the principal witnesses. Much of the testimony suggests a tendency to embellish or revise the facts in a direction which is favorable to the witness' own point of view. Where as here, 2 or 3 years elapsed between the events in question and the hearing, and most of the witnesses have a partisan interest in the outcome of the case, their testimony must be viewed with considerable caution.

Ultimately, the ALJ did not credit testimony about several alleged instances of misconduct, including some of the most serious charges such as brandishing a gun, threatening anti-Union employees and their families, and vandalizing Company property. He further found that several incidents including arguments, an automobile accident, an attempted break-in, and flat tires, were unrelated to the election because they were

---

2. In this case, the ALJ's credibility assessments were primarily based upon his analysis of the contents of the various witnesses' testimony, rather than the demeanor of the witnesses. Particular weight is given to credibility findings based upon demeanor. *Canteen Corp.,* 202 N.L.R.B. 767, 769, 82 L.R.R.M. 1748 (1973). A court may make an independent evaluation of credibility findings based on other factors. *Id.* But the court must still defer to credibility findings, based on other factors, which have sufficient support in the record.

personal matters or occurred after the election or were totally fortuitous. He credited accounts of five arguably coercive incidents, which we will discuss below, but concluded that they were not sufficiently serious to warrant setting aside the election.

 After our review of the entire record, it is difficult to imagine more detailed or better reasoned credibility findings than those made by the ALJ in this case. Because his assessments are supported by substantial evidence in the record and are not shocking to the court's conscience, we are bound by them. We will disregard, therefore, the alleged incidents which the ALJ discredited.[3]

The ALJ credited the following five incidents:

1. Employee Anether Hall, a member of the pro-Union committee, told employee Willie Daniel that the Union would take him to court because he had stopped attending Union meetings.

2. Employee Bernice Franklin testified that employee Beverly Washington told her that Beverly had said to employee Mary Windham that Mary could get hurt wearing an anti-Union sticker but that Beverly was only kidding.

3. Employee Edwin Bachman, a member of the pro-Union committee, asked employee Estelle Nugent to vote for the Union. When she replied that she did not think the employees needed a union, he said that there might be "complications," like the air let out of her tires or her tires slashed or acid poured on her car. He added that he was not implying that this would happen to her but that "there could be complications."

4. At a Company meeting for 35 to 40 employees, employee Bobby Brewer, a member of the pro-Union committee, complained that only pro-Union employees were receiving written warnings for tardiness. Employee Charles Davis defended the Company, saying that the anti-Union employees were also being subjected to the Company's tardiness program. Brewer then shook her finger at Davis and shouted, "if [you are] so damned smart why [don't you] get up there [with the Personnel Manager]" and "you better watch your white ass or someone is going to get you good, brother."

5. At another of the Company meetings, employee James Alford asked the Personnel Manager how much money the Company's president made. Employee Herbert Robinson asked Alford what difference that made. Alford retorted that he would "straighten" Robinson out.

None of these direct or implied threats was ever carried out.

We turn next to the ALJ's conclusion that the credited incidents did not warrant setting aside the election. Having made credibility assessments and findings of fact, the ALJ proceeded to make conclusions of law about the effect of the five credited incidents, which he concluded "fell far short of demonstrating a pattern of intimidation directed at anti-union employees or even at a single anti-union employee."

He defined the scope on remand thusly:

I reject the Company's argument in its brief that my sole function in deciding this case is to resolve the credibility questions posed by the evidence concerning the Company's objections. The Board's order directing a hearing in accordance with the Court's remand, specifically directs that the Administrative Law Judge hearing this proceeding shall prepare a decision containing findings of fact, conclusions of law and recommendations. The Company's argument is based on the premise that the Court of Appeals resolved all of the legal issues in this case when it held that a hearing was warranted. That premise is erroneous. The Court could not and did not resolve these

---

**3.** The Company has cited numerous cases for the proposition that threats such as those discredited here are sufficient to warrant setting aside an election. *E. g., NLRB v. Van Gorp Corp.*, 615 F.2d 759 (8th Cir. 1980); *Wilkinson Mfg. Co. v. NLRB*, 456 F.2d 298, 304 (8th Cir. 1972); *Gabriel Co.*, 137 N.L.R.B. 1252, 50 L.R. R.M. 1369 (1962). The obvious distinction, however, is that in the cited authorities the allegations were credited, whereas here they were not.

questions, because the factual record was incomplete. Rather, the Court simply held, in essence, that the Company came forward with evidence which if fully credited, unexplained or uncontradicted by credible evidence and interpreted in a manner most favorable to the Company's position, would warrant setting aside the election. Insofar as the Court cited decisional authority in support of its conclusion, I have considered and, where appropriate, discussed those authorities insofar as they are applicable or inapplicable to the facts as determined in this Supplemental Decision.

The Company again asserts that our previous decision is the "law of the case," citing *Synalloy Corp., Blackman-Uhler Chemical Division*, 239 N.L.R.B. 637, 99 L.R.R.M. 1702 (1978). In short, the Company urges that we had considered already the specific allegations of misconduct and determined that they were "sufficient to warrant setting aside the election, if true. . . ."

■ We must agree with the ALJ, however, that the above-quoted language was not intended to limit the scope of authority of the Board. There were over twenty specific allegations of misconduct; all but five were discredited. In fact, all of the incidents that this court listed as "examples of alleged violence and intimidation," 571 F.2d at 434 n.2, were discredited. The opinion gave no guidance on the effect of any single incident or of any combination of incidents. We did not hold that each incident "if true" was sufficient to warrant setting aside the election. Until the facts were determined, this court could not and did not determine their legal effect. Therefore, the ALJ correctly developed a full record and reached conclusions of law.

■ "In election proceedings, it is the Board's function to provide a laboratory in which an experiment may be conducted, under conditions as ideal as possible to determine the uninhibited desires of the employees. . . ." *General Shoe Corp.*, 77 N.L.R.B. 124, 127 (1948). An election will be overturned where the objecting party has proven the occurrence of violence or threats of violence. A distinction is made, however, between coercive actions undertaken by a party and coercive actions undertaken by individual employees or third parties. Because "neither unions nor employers can prevent misdeeds . . . by persons over whom they have no control," less weight is given to misconduct by individual employees or third parties. *NLRB v. Griffith Oldsmobile, Inc., supra*, 455 F.2d at 870. Accordingly, where the threats or violence are not attributable to the union or the employer, the election will be overturned only if the coercive actions have created "an atmosphere of fear and reprisal such as to render free expression of choice impossible." *Id.* A small number of isolated and non-coercive threats would not be sufficient to justify setting aside the election. *Abbott Laboratories v. NLRB*, 540 F.2d 662, 665–67 (4th Cir. 1976) ("rough talk" not sufficient).

The Company has proven five threats. Nowhere does the Company maintain that these threats were either authorized or condoned by the Union, but the Company does argue strenuously that three of the incidents were attributable to the Union because pro-Union committee members had apparent authority to act on behalf of the Union. We agree with the ALJ, however, that the pro-Union committee was a "large and amorphous" group whose members were not viewed by the employees as Union agents. *See Certain Teed Products Corp. v. NLRB*, 562 F.2d 500, 509–10 (7th Cir. 1977) (campaign activity alone does not establish the requisite close connection with the union). *Compare NLRB v. Georgetown Dress Corp.*, 537 F.2d 1239 (4th Cir. 1976) (committee was union's only contact with workers; no professional organizers). Therefore, this election will be overturned only if the five threats created "an atmosphere of fear and reprisal."

■ The Company has recited numerous incidents which allegedly coerced anti-Union employees and created "an atmosphere of fear and reprisal." But the testimony relied upon by the Company to establish several of these incidents has been expressly discredited, and the Company failed to

prove that several of the remaining incidents were related to the election campaign. The ALJ found that only five incidents actually occurred, were potentially coercive and were related to the election campaign. Moreover, none of the five credited incidents involved Union representatives or employees acting as agents of the Union, and none resulted in any physical harm or violence. *Compare NLRB v. Van Gorp Corp.*, 615 F.2d 759 (8th Cir. 1980) (escalating threats culminating in an act of violence). Once the discredited and unrelated incidents are omitted, the Company is left contending that five empty threats, occurring during a ten-week election campaign involving over 800 eligible voters, so tainted the election process that it was an abuse of discretion to allow the election results to stand. We reject that contention and, therefore, affirm the ALJ's conclusion that the arguably coercive threats did not warrant setting aside the election.

## II. *Misleading Handbill*

The Company also contends that, immediately before the election, the Union made material misrepresentations in a handbill about a contract between the Union and another employer, namely Huck Manufacturing Company (Huck).

Beginning on April 22, 1976, at small group meetings held for its employees, the Company began to review the Union's record after it organized employees at Huck. Using the chart entitled "UAW Promises vs. Performance," the Company spokesman made the point that, despite the Union's preelection promises there, the Union had been unable to negotiate improvements or sign a labor contract at Huck. Employees began to question the Union representative about the situation at Huck.

On April 29, between 6 a. m. and 7 a. m.—less than twenty-four hours before the polls were to open—the Union issued a handbill with "The Huck Story." The handbill stated in relevant part:

The UAW and Huck entered negotiations for a contract at Waco, Texas. Negotiations have now been completed and a contract agreed upon by the UAW and Huck *and accepted by the members*

*The UAW-Huck contract provides* :

1) Fully paid Hospitalization Insurance for the employee and their dependents.

2) Fully paid sick and accident insurance that pays the employee 50% of his base rate up to fifty-two (52) weeks, Example—An assembler at Huck, under the UAW-Huck contract earns $4.47 per hour—or $178.80 for a 40 hour week. If sick and disabled, this assembler will draw sick benefits of $89.40 a week for an illness up to 52 weeks.

3) Wage rates up to $5.73, per hour.

4) A $9,000 *Company paid* life insurance policy.

(Emphasis in original.)

The handbill thus contained four questionable statements. First, Huck had no "assemblers" and no assembly line operation whatsoever, whereas about one-third of the Company employees were assemblers. Apparently the handbill referred to Huck's "assembly-band annealer set up," which is a higher job classification. Second, the nonexistent "assemblers" classification at Huck was listed as earning $1.17 per hour more than the actual assemblers at the Company. Third, the Union and Huck had not executed a contract. Although the Union had "agreed upon" the substantive terms, when it signed Huck's proposed agreement, it changed the duration clause. As a result, Huck broke off negotiations and the contract was not executed.[4] Fourth, the proposed contract, which was not in effect in any event, provided for $6,000 in current insurance benefits with an eventual increase to $9,000.

Between 9 a. m. and 11:30 a. m. of that same morning, the Company posted its response. The Union's flier was annotated,

---

**4.** Subsequently the Union lost a decertification election at Huck, so the Union and Huck never did have an executed contract.

enlarged to poster size and placed on all the main plant's bulletin boards.[5] The annotations reiterated that no contract was in effect at Huck, stated that Huck employees had a $6,000 life insurance policy, and asserted that the Huck "assemblers" did not perform work comparable to the Company's assemblers. They did not, however, clarify that Huck had no employees classified as "assemblers" because the Company did not learn this fact until after the election.

The ALJ found that Huck was not a major campaign issue. He also found that the statements in the Union flier were "either literally true, or believed to be true by the parties involved, although each statement was arguably misleading." For example, it was "literally true" that the union membership had accepted the contract, although the contract was not executed. Similarly, it was "literally true" that the contract provided for certain benefits, although the contract was never in effect. On the other hand, the Union "believed" that it had a contract with Huck because, on April 3, the Union notified Huck that the Union accepted Huck's proposed contract. It was not until May 6—after the certification election at the Company—that the Union's international representative altered the duration clause of the proposed contract, and not until May 17 that Huck broke off negotiations on the contract.

Therefore, the ALJ held that there was no misrepresentation which would warrant setting aside the election. Alternatively, he found that the Company had had an adequate opportunity to respond to the handbill prior to the election.

 In assessing preelection campaign statements for both employers and unions, the Board does not ordinarily "police or censor propaganda used in the elections it conducts, but rather leaves to the good sense of the voters the appraisal of such matters, and to opposing parties the task of correcting inaccuracies and unlawful statements." *Linn v. United Plant*

*Guard Workers*, 383 U.S. 53, 60, 86 S.Ct. 657, 662, 15 L.Ed.2d 582 (1966), *citing Stewart-Warner Corp.*, 102 N.L.R.B. 1153, 1158, 31 L.R.R.M. 1397, 1399 (1953). The standard for reviewing alleged campaign misrepresentations is the following:

> [A]n election . . . [will] be set aside only where there has been a misrepresentation or other similar campaign trickery, which involves a substantial departure from the truth, at a time which prevents the other party or parties from making an effective reply, so that the misrepresentation, whether deliberate or not, may reasonably be expected to have a significant impact on the election . . . . [E]ven where a misrepresentation is shown to have been substantial, the Board may still refuse to set aside the election if it finds upon consideration of all the circumstances that the statement would not be likely to have had a real impact on the election.

*ITT Blackburn Co. v. NLRB*, 545 F.2d 58 (8th Cir. 1976), *citing Hollywood Ceramics Co., Inc.*, 140 N.L.R.B. 221, 224, 51 L.R.R.M. 1600, 1601–02 (1962). The burden is on the objecting party to prove prejudice to the fairness of the election. *NLRB v. Target Stores, Inc.*, 547 F.2d 421, 424 (8th Cir. 1977).

 The wording of the handbill may have implied that the Huck contract was in effect or that the Huck employees were currently receiving benefits provided in that contract. The ALJ's conclusion that these did not amount to material misrepresentations is nevertheless supported by substantial evidence. First, the references to the status of the contract were literally true. Second, the contract terms were actually negotiated by the Union but were not in effect for a reason that was beyond the Union's knowledge. *See NLRB v. Southern Health Corp.*, 514 F.2d 1121, 1125 (7th Cir. 1975) (negotiated terms exceeded wage stabilization guidelines; distinguishing cases where a union took credit for terms it had not negotiated).

---

**5.** The Company poster actually preceded the Union flier to the satellite plant. There the poster arrived at 3:45 p. m. on the 29th, and the flier arrived on the morning of the 30th, just before the election.

The ALJ's conclusion that the "assembler" wage rate was not a material misrepresentation is not, however, supported by substantial evidence. Misrepresentations about wages "go to what is perhaps the most crucial issue of any organization effort: whether the company is paying the bargaining unit employees as much as it would if the employees were represented by the union." *J.I. Case Co. v. NLRB*, 555 F.2d 202, 205 (8th Cir. 1977). *See LaCresent Constant Care Center, Inc. v. NLRB*, 510 F.2d 1319 (8th Cir. 1975). The ALJ noted that Huck had no employees in the classification of "assembler" and further that there was no basis for comparing the functions of the Huck employees at the higher wage rate with the assemblers at the Company. Almost one-third of the employees at the Company were assemblers. Therefore, the statement in the Union handbill that "assemblers" at Huck earned more, under a Union contract, than non-Union assemblers did at the Company could reasonably be expected to affect significantly the outcome of the election.

The issue remains, then, whether the Company had an adequate opportunity to reply to the misrepresentation about "assembler" wage rates.

"Adequate time to reply must mean adequate time to make an effective reply.... [A] last minute bare denial cannot be an effective reply." *Cross Baking Co. v. NLRB*, 453 F.2d 1346, 1350 (1st Cir. 1971). It is particularly difficult for an employer to rebut a union's misrepresentations about the terms of a contract it negotiated because "workers would be likely to give special weight to a Union official's interpretation of the language of a collective bargaining agreement to which the Union is a party ...." *NLRB v. Van Gorp Corp., supra*, 615 F.2d at 762 (union representative reinforced misrepresentation by quoting from contract which was complex and confusing). It has been held that a company does not have an adequate opportunity to reply to a letter first circulated the day before the election where "[t]he

claims of the union were largely based upon calculations using figures derived from other unidentified calculations. Any reply would necessarily have required careful preparation." *J.I. Case Co. v. NLRB, supra*, 555 F.2d at 207.

This situation can be distinguished, however, from a "last minute bare denial" or a reply necessitating "careful preparation." In fact, the Company had already disseminated the correct information during its employee meetings. When the Company learned of the handbill, its personnel director had already been in contact with the Huck management and gathered all the information on the contract. That morning the assistant personnel director again telephoned Huck and received more detailed information, including the duties performed by the Huck "assemblers" who earned $4.47 per hour. The preparation was complete. Within hours, the Company formulated a point-by-point reply, had it blown up to poster size, and placed copies on the plants' bulletin boards. The evidence showed that the bulletin boards were an effective means of communicating with the employees; due to high interest in the campaign, they went to read any notice posted there.

The Company did rebut the misrepresentation about "assembler" wage rates. The reply stated that the Huck "assemblers" did not perform work comparable to the assembly line workers at the Company. Certainly, the employees understood that if the functions were not comparable the wages would not be comparable, regardless of the name. Therefore, the Company had an adequate opportunity to reply to the one material misrepresentation in the handbill.

### III. *Adversarial Hearing*

The Company contends that the ALJ improperly sanctioned the adversarial role of the General Counsel at the hearing. This court has held that there is no denial of due process merely because a hearing on remand is conducted in the context of an unfair labor practice proceeding rather than

a representative proceeding.[6] *NLRB v. Commercial Letter, Inc.*, 496 F.2d 35, 38 (8th Cir. 1974). But the Company says it is not objecting to the context per se but because the General Counsel assumed such an adversarial role that substantial prejudice to the Company resulted.

The Board has set forth the following standard for the General Counsel in presenting evidence:

> ... the role of a responsible agent of the Board in attempting to assure that a determinative issue concerning employee choice in a Board-conducted election be resolved on the basis of competent evidence and a record fully presenting the evidence developed in the prehearing investigation.

*Sahara-Tahoe Corporation d/b/a Sahara-Tahoe Hotel*, 173 N.L.R.B. 1349, 69 L.R. R.M. 1590 (1968).

The Company's only specific allegation of misconduct was that the General Counsel failed to call Company witness Roger Tyson. At the hearing, Tyson was called as a rebuttal witness by the Company and the ALJ struck his testimony as improper rebuttal testimony. The record shows, however, that Tyson testified concerning evidence that was not mentioned in his investigatory affidavit. Thus the General Counsel was not on notice of the evidence that the Company sought to introduce on rebuttal. Consequently, in failing to call Tyson, the General Counsel was not attempting to deny the Company a full and fair hearing.

Here, the ALJ explicitly held:

> ... General Counsel recognized that as a government representative, it was obliged to present available material evidence unknown to the Company whether favorable or unfavorable to the Company's position. I am satisfied that this was done.

Furthermore, responding to an identical complaint that the General Counsel resisted introducing evidence favorable to the Company in order to enhance its chances of success in the unfair labor practice charge, the Fourth Circuit reasoned:

An alleged conflict of interest said to arise from the dual role played by the Board's attorney in consolidated proceedings may be more apparent than real, and a denial of due process cannot be established by this theoretical conflict, at least where, as here, the company was adequately represented by competent counsel .... The company was given ample opportunity to produce evidence of its own and to cross-examine adverse witnesses. (citations omitted)

*Barrus Construction Co. v. NLRB*, 483 F.2d 191, 195 (4th Cir. 1973). *See also NLRB v. Bancroft Manufacturing Co.*, 516 F.2d 436, 446 (5th Cir. 1975), *cert. denied*, 424 U.S. 914, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1976) ("... the ULP hearing boasts all of those procedural safeguards ordinarily associated with the concept of due process").

The Company in this case has likewise received due process. The General Counsel recognized its duty to present material evidence unknown to the Company. The Company was ably represented by counsel. The Company had the opportunity to produce evidence and to cross-examine adverse witnesses. And, finally, the Company demonstrated no prejudice as a result of the General Counsel's dual role at the hearing. Therefore, the Company had a full and fair hearing.

Accordingly, the Company's petition to set aside is denied and the Board's order is enforced in full.

---

**6.** Our remand directions did not specify which type of hearing should be conducted.