**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**BOSTIK DIVISION, USM CORPORATION, Respondent.**

No. 74–1599.

United States Court of Appeals, Sixth Circuit.

June 13, 1975.

■■■■■■■■■

Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D. C., Paul J. Spielberg, John F. Depenbrock, Peter G. Nash, John S. Irving, Patrick Hardin, John J. A. Reynolds, Jr., Director, Region 26, N.L.R.B., Memphis, Tenn., for petitioner.

W. Bruce Swain, Bowling, Brackhahn & Jackson, Yelverton Cowherd, Jr., Richard A. Brackhahn, Memphis, Tenn., for respondent.

Before EDWARDS, MILLER and LIVELY, Circuit Judges.

. MILLER, Circuit Judge.

This case is before the Court upon application of the National Labor Relations Board for enforcement of its order issued against Bostik on April 2, 1974. The Board found that Bostik had violated Sections 8(a)(5) and (1) of the Act by refusing to bargain with the Union, which had been certified as the exclusive bargaining representative of Bostik's employees. The Board granted the Union's motion for summary judgment on the ground that all issues raised by Bostik were or could have been litigated in the prior representation proceeding. The company was ordered to cease and desist from the unfair labor practices found, to bargain with the Union upon request, and to post appropriate notices.

To determine whether the Board erred in its findings that Bostik violated the Act in refusing to recognize and bargain with the Union we must reach the question whether the Board properly certified the Union as the representative of Bostik's employees.

On May 8, 1972 the Union filed a representation petition with the Board, seeking to represent a bargaining unit of the company and on June 21 a Board conducted election was ordered. This election was held on August 3, 1972, resulting in a vote of 60 to 54 in favor of the Union, with three ballots challenged.

The company filed objections on August 10 to certain conduct allegedly affecting the results of the election. It was contended that certain actions and conduct of Union sympathizers had destroyed the laboratory conditions required for conducting a free election.

An investigation of the company's objections was made by the Board's Regional Director. He concluded that the objections should be overruled in their entirety. On November 2, 1972 the Board granted a request for review of certain issues and a hearing was held in which all parties participated. It was the conclusion of the hearing officer that the incidents upon which the company based its complaints had in fact occurred but that they had not created "an atmosphere of fear and reprisal rendering a free expression of choice of representatives impossible."

The company subsequently filed timely exceptions to the hearing officer's report, contending that the cumulative effect of the employees' pre-election conduct had been disregarded and arguing that the atmosphere of fear and reprisal created by such conduct had precluded a free election. The Board reviewed the rulings of the hearing officer and found that no prejudicial error had been committed (Chairman Miller dissenting). The hearing officer's conclusions and recommendations were adopted and the Union was certified as the employees' exclusive bargaining representative.

On May 8, 1973, the Union requested the company to bargain with it as the certified exclusive bargaining representative. The company refused. A complaint then issued, alleging that the company's refusal was a violation of the Act. In its answer, the company admitted its refusal to bargain but again challenged the validity of the Union's certification on the same grounds advanced previously in its August 10 objections. The Union then moved for summary judgment which was granted by the Board.

The company's objections revealed some 20 incidents which can be con-

sidered as relevant to the issue before us. There were four occasions of apparent physical threats during the course of the Union campaign. The threats objected to were of the nature of those not uncommon among workers in an industrial setting.[1] These comments, even in the context of an upcoming Union election, are not the type that would be expected to have a coercive impact. Such irresponsible threats are almost inevitable in the course of a heated election campaign and most employees doubtless expect such exchanges.

■ In evaluating the impact of the threats, we must take account of affirmative evidence in the record indicating that the "threats" were not considered or intended seriously and had no inhibitory effect on the voters. There was evidence that two employees involved in several of the incidents "always kidded and joked around with each other a lot," and that the employee to whom the abusive language was directed "kind of laughed" and replied that "if he thought he could, [to] go ahead and try it." The same "threatened" employee further testified that he was not intimidated and voted against the Union.

Woods, the recipient of another of the so-called threats, also voted against the Union and testified that there was nothing personal between him and the one using the supposedly threatening language. The hearing officer found that it had not been established that the threat to Woods was in any way connected with the Union campaign, a finding supported by substantial evidence. Employee James testified that he did not consider the language directed at him and objected to by the company to be a threat of physical harm. James also ultimately voted against the Union.

■ In addition to the above mentioned "threats" of bodily harm, there were some eight incidents of other allegedly threatening statements made by various employees. A portion of these occurrences may be generally characterized as expressions of displeasure at views expressed against the Union,[2] or as forecasts of what would happen to certain employees if the Union was voted in.[3] We do not deem such comments as necessarily having an intimidating effect. We agree with the Board that the projection into the future and threats obviously beyond the speaker's power to accomplish were not of such character as to create an atmosphere of fear or reprisal.

Other allegedly threatening incidents are properly characterized as employees' joking or making vague and ambiguous off-hand comments concerning what could happen[4] rather than as serious threats of reprisal for failure to support the Union.

A final set of allegedly threatening incidents related to employee Carson, a known Union opponent. Despite these incidents, however, Carson stated that he did not change his views throughout the campaign but continued to speak against the Union. He subsequently served as an observer for the company in the election. We agree with the hearing officer that the incidents concerning Carson had no significant impact and did not contribute to a general atmosphere of fear and coercion.

---

1. An example of the type of encounter complained of is provided by the following exchange: About a week before the election when employee Johnson approached employee James and asked why James was not "for the Union," James replied that Johnson could not tell him "what good the Union would do." To this Johnson retorted that James "was going to get [his] ass kicked."

2. For instance, Johnson made the comment to another employee that "a man would almost have to fight me if he told me that the Union was no good. I would take that as the same thing as spitting in my face."

3. For example, employee Wadkins remarked at one point that if certain parties did not vote for the Union and the Union came in all new employees would be laid off.

4. Objected to was a comment by employee Elrod that employee Neil's barn "would make a big fire, wouldn't it?"

In summary, we find that the statements or comments described as threatening or intimidating to have been so innocuous as to have had no real effect, or to have been so obviously beyond the apparent authority of the speakers to accomplish, that they did not destroy the laboratory conditions required for the election. It has been recognized by this Court that

> [i]solated threats or coercion by the Union or its adherents are not sufficient to warrant setting an election aside. Unions and employers cannot prevent misdeeds or misstatements by persons over whom they have no control. It is our view that the employees had a fair opportunity to express and did express their free and untrammeled desires in the election in question. *Matlock Truck Body and Trailer Corp.* v. *N.L.R.B.,* 495 F.2d 671, 673 (6th Cir.), *cert. denied* 419 U.S. 964, 95 S.Ct. 224, 42 L.Ed.2d 178 (1974).

There were also four occasions when anti-union employees sustained damage to their personal automobiles. Employee Edelman found one of the tires on his car cut while parked on the company lot. The flat was caused by "a nice clean cut" and the tire could not be repaired. Approximately a week prior to the election, employee Neil's truck, which had been parked overnight about two blocks from the plant, sustained damage when the fan went through the radiator about a mile and a half from where the truck started. A few days before the election, employee Frierson found a cut on a tire of his car parked in the company lot. About the same time, employee Skaggs testified, that the hood of his car had apparently been kicked in while parked at the plant.

As recognized by the hearing officer, there was no substantial evidence that the above damage to the vehicles was intentional or that, if caused by vandalism, it was caused by Union adherents. In none of the incidents did the owner of the car establish a causal connection with the Union campaign. There is testimony that when the damage was called to its attention, the Union expressed displeasure over such actions rather than making threats that more of the same kind of conduct was in store for those not supporting the Union. Given the time span over which the occurrences took place, it cannot be said that the four instances contributed to a general state of fear or anxiety. On the contrary, there is testimony to the effect that such incidents only confirmed the opinion of employee Skaggs that he did not want the Union to win the election. It is well settled that "[p]roperty destruction of a somewhat minor nature" which is "wrought on the cars of employees who [are] against the cause" is not a sufficient basis to set aside the findings of the Board if there is no evidence that "any of these incidents prevented any of the employees from voting their free choice." *Matlock Truck Body and Trailer Corp.* v. *N.L.R.B.,* 495 F.2d 671, 673-74 (6th Cir.), *cert. denied,* 419 U.S. 964, 95 S.Ct. 224, 42 L.Ed.2d 178 (1974).

There is also evidence of four instances of tampering with company equipment in the month preceding the election. On or about June 28, 1972, and again on July 14, 1972, the distributor wires on a forklift were switched, causing down time and requiring maintenance of the forklift. On July 12, 1972, the main switch on a glue slug line was turned off during a screen change, causing about a half-hour of down time. On August 3, the day of the election, the distributor wires on the forklift were cut and towels were discovered on the forklift manifold which, if they had gone undetected, might have caused a fire. As in the case of damage to personal automobiles, we agree with the finding of the hearing officer that the occurrences were not shown to have been other than the result of accident or inadvertence. In any event, no link to the Union campaign was established and there is no error in the finding that the incidents did not contribute to a pervading coercive atmosphere.

The company also relies on the fact that a crowd gathered across the street from the plant on the day of the election. There was no evidence, however, that the crowd in any way interfered with the conduct of the election. Bostik particularly points to the incident when Reid approached the plant and decided to go home rather than enter the plant as he had intended. It is significant, however, that Reid had already voted and was not arriving at the plant to begin his shift. He was merely returning to the plant to check on the outcome of the election. There is no indication that the presence of the "crowd" in any way affected the outcome of the election.

It can be seen from the above description that the company's objections go to a handful of isolated incidents occurring among some 119 employees over a three month period preceding the election. These occurrences included a number of vague threats, minor damage to personal automobiles and minor tampering with company equipment. No personal injuries were caused and no connection with the Union was established.

In reviewing the findings of the Board, the rule is that a party who seeks to overturn the results of a representation election has the burden to show that the election was not fairly conducted. *N.L.R.B.* v. *Dean Foods Co.,* 421 F.2d 664 (6th Cir.), *cert. denied,* 398 U.S. 939, 90 S.Ct. 1843, 26 L.Ed.2d 271, *rehearing denied,* 399 U.S. 937, 90 S.Ct. 2239, 26 L.Ed.2d 809 (1970). It is settled that this burden "is not met by proof of mere misrepresentations or physical threats. Rather, specific evidence is required, showing not only that unlawful acts occurred, but also that they interfered with the employees' exercise of free choice to such an extent that they materially affected the results of the election." *N.L.R.B.* v. *White Knight*

*Manufacturing Co.,* 474 F.2d 1064, 1067 (5th Cir. 1973), *quoting from N.L.R.B.* v. *Golden Age Beverage Co.,* 415 F.2d 26, 30 (5th Cir. 1969). We are convinced from a review of the record as a whole that the company failed to meet the burden of proof resting upon it.[5]

We agree with the evaluation of the conduct of the company employees expressed by the hearing officer:

. . . I see the matters alleged by the Petitioner and which I have credited in part, as isolated instances composed mainly of remarks made among fellow employees typical of the sort of remarks to be found in an industrial situation. One must bear in mind that we are not dealing with a group of fictional characters who are scrupulously attempting to maintain ideal conditions for an election. We are instead dealing with working men who are as much aroused to passion and hot blood over an election campaign as they are politics and sporting events. That passion oftentimes swells to outburst of heated words and ill considered statements. But, when evaluated in their context by the recipients, most often they are dismissed for what they are. As in this case, the recipients of the remarks acted in such fashion, and almost uniformly testify that they voted their convictions despite them. Additionally, there was no testimony that any employee was hampered in any way at the polls and there was no testimony that each employee was not allowed to cast his ballot at the polls freely and without coercion. (footnote omitted)

We are of the opinion that the Board did not abuse its discretion in concluding that "there did not exist at the time of the election an atmosphere of fear and reprisal rendering a free expression of ideas impossible."

5. We are not unaware of the fact that the result of the election in this case could have been reversed by changing only four votes and that such a closeness in election results has been recognized as an important consideration which demands that "any minor violation of the Act cannot be dismissed summarily for it could have swayed the crucial vote." *N.L.R.B.* v. *Overland Hauling, Inc.,* 461 F.2d 944, 946–47 (5th Cir. 1972).

In addition to the other objections to the election, the company also maintains that the Union, through the conduct of its observer, Harold Johnson, violated Board policy established in *Milchem, Inc.,* 170 N.L.R.B. No. 46 (1968). In *Milchem* the Board declared the following policy:

Careful consideration of the problem now convinces us that the potential for distraction, last minute electioneering or pressure, and unfair advantage from prolonged conversations between representatives of any party to the election and voters waiting to cast ballots is of sufficient concern to warrant a strict rule against such conduct, without inquiry into the nature of the conversations.

The objection in this case stems from an affidavit of employee Carson, the company observer at the election. Carson stated that Union observer Johnson engaged in conversation with employees waiting in line. Carson observed Johnson engaging in three separate two to three minute conversations of this nature. Johnson denied that such conversations took place until after the individuals had voted. Other company observers could not confirm that Johnson had talked to voters as alleged. Carson could not identify the persons with whom Johnson allegedly talked and no employee was produced to testify that he had talked with Johnson. In addition, Carson had signed a certificate at the close of the election attesting that the election had been properly conducted, making no mention of this alleged misconduct.

The Regional Director concluded that the company's evidence fell short of establishing a *Milchem* violation, thus not crediting the affidavit of Carson. In its request for review, the company argued that the Regional Director erred in not ordering an evidentiary hearing on the matter. We find, however, that the Board did not abuse its discretion in upholding the Regional Director's conclusion upon the testimony and other evidence presented.

We note in passing that even if Carson's statement is given full credence, it is not at all clear that a *Milchem* violation can be found. The Board, in enunciating this policy, stated that it "does not mean that any chance, innocuous comment or inquiry by an employee or Union official to a voter will necessarily void the election," and that the "application of [the] rule should be informed by a sense of realism." 170 N.L.R.B. 362, 363 (1968).

We hold that the findings of the Board are supported by substantial evidence on the record considered as a whole. The Board's petition for enforcement is hereby granted.