AMALGAMATED CLOTHING AND TEXTILE WORKERS UNION, AFL–CIO, CLC, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

M. Lowenstein Corporation, Intervenor.

M. LOWENSTEIN CORPORATION, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

Amalgamated Clothing and Textile Workers Union, AFL–CIO, CLC, Intervenor.

Nos. 82–2359, 83–1369.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 13, 1984.

Decided June 22, 1984.

Leon Schulzinger, New York City, with whom Arthur M. Goldberg and David M. Heiser, New York City, were on the brief, for Amalgamated Clothing and Textile Workers Union, petitioner in No. 82–2359 and intervenor in No. 83–1369.

John S. Burgin, Greenville, S.C., with whom Stuart M. Vaughan, Jr., Greenville, S.C., was on the brief, for M. Lowenstein Corp., petitioner in No. 83–1369 and intervenor in No. 82–2359.

Christine Weiner, Atty., N.L.R.B., Washington, D.C., with whom Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., was on the brief, for respondent.

Before WRIGHT, MIKVA and BORK, Circuit Judges.

Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.

Concurring opinion filed by Circuit Judge BORK.

J. SKELLY WRIGHT, Circuit Judge:

On July 1, 1981 a representation election was held at the Morganton, North Carolina plant of M. Lowenstein Corp. (the company). The Amalgamated Clothing and Textile Workers Union (the union) won the election by the narrow margin of 101–94. In addition to the counted ballots, five ballots were challenged. Today, more than two and a half years later, collective bargaining between the company and the employees' elected representative at the plant has yet to begin. In the intervening period the company has contested the National Labor Relation Board's decision to certify the union and has refused to obey the Board's bargaining order so that it may obtain judicial review of the certification decision. *See Boire v. Greyhound Corp.,* 376 U.S. 473, 477–478, 84 S.Ct. 894, 896–897, 11 L.Ed.2d 849 (1964) (certification decisions are not reviewable as such, but can be examined in the course of proceedings brought against employer for refusal to bargain); *American Federation of Labor v. NLRB,* 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347 (1940) (same); *Hartz Mountain Corp. v. Dotson,* 727 F.2d 1308, 1310–1312

(D.C.Cir.1984) (discussing cases). The Board in turn has found the company's refusal to bargain to be an unfair labor practice in violation of Sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), 158(a)(5) (1982). In No. 83–1369 the company petitions for review of the Board's unfair labor practice finding. In No. 82–2359 the union petitions for review of the Board's remedy for the unfair labor practices. The Board has cross-applied for enforcement of its order. For the reasons that follow we affirm the Board's order in all respects.

The procedural history of this case is apparently not unusual. The company filed timely objections to the election results. Among the objections urged by the company—and the only objections before the court today—were allegations that union agents and supporters had threatened and otherwise coerced eligible voters, thereby destroying the "laboratory conditions" required for an NLRB election. On September 1–2, 1981 a hearing was held on the company's charges. On November 5, 1981 the Hearing Officer issued his report recommending that the Board reject the company's charges and certify the union as the exclusive representative of the employees in the bargaining unit. The Board accepted [1] the Hearing Officer's recommendations on March 17, 1982. After the company refused to bargain or to supply information to the union, the union filed an unfair labor practice charge. Both the NLRB General Counsel and the union filed motions for summary judgment before the Board, with the union's motion including a request for special "make whole" remedies (*i.e.*, an "interim" grievance procedure, liti-

---

**1.** The Board adopted the Hearing Officer's findings and recommendations in full, with the following proviso: "In finding that the allegedly objectionable conduct did not interfere with the employees' free choice in the election, we disavow the Hearing Officer's reliance on the subjective effect on the employees' state of mind." *M. Lowenstein Corp. and ACTWU,* Decision and Certification of Representative, NLRB Case 11–RC–4999, March 17, 1982, at 1 n. 2, *reprinted in* Appendix to the Briefs (App.) 36. Presumably, the Board is referring here to the Hearing Offi-

cer's discussion of the fact that no evidence was introduced to show that any employee actually changed his vote as a result of the alleged fear or coercion. Because we rely only on those portions of the Hearing Officer's findings that were approved by the Board, this proviso is irrelevant for present purposes. Therefore, there is no need to distinguish between the Hearing Officer and the Board in what follows, and our references to the Hearing Officer should be understood as references to the Board as well.

gation expenses, attorney fees, and a bargaining order retroactive to the date of the election).

On September 24, 1982 the Board granted the General Counsel's summary judgment motion and denied the union's request for special remedies. 264 NLRB No. 14 (1982). It is this decision—challenged by the company as to liability and by the union as to remedy—that is before the court in this proceeding.

### I. THE LIABILITY DETERMINATION

#### A. *Applicable Legal Standards*

■ The Board has stated that a representation election should be held in "laboratory * * * conditions as nearly ideal as possible, to determine the uninhibited desires of the employees." *General Shoe Corp.*, 77 NLRB 124, 127 (1948). But, although the "laboratory conditions" standard represents a noble ideal, it must be applied flexibly, for in its extreme form it is a standard that "no seasoned observer considers realistic." Bok, *The Regulation of Campaign Tactics in Representation Elections Under the National Labor Relations Act*, 78 HARV.L.REV. 38, 45 (1964). We have noted "that union elections are often not conducted under ideal conditions" and that "there will be minor (and sometimes major, but realistically harmless) infractions by both sides, and that the Board must be given some latitude in its effort to balance the right of the employees to an untrammeled choice, and the right of the parties to wage a free and vigorous campaign." *NLRB v. Mar Salle, Inc.*, 425 F.2d 566, 571 (D.C.Cir.1970) (internal quotation marks omitted); *accord NLRB v. ARA Services, Inc.*, 717 F.2d 57, 66 (3rd Cir. 1983) (*en banc*) ("Given the nature of inter-employee relations, the Board cannot realistically be expected to create a totally frictionless election environment."); *NLRB v. Heath Tec Division/San Francisco*, 566 F.2d 1367 (9th Cir.1978); *Bush Hog, Inc. v. NLRB*, 420 F.2d 1266, 1267 (5th Cir.1969). It is for the Board in the first instance to make the delicate policy judgments involved in determining when laboratory con-

ditions have sufficiently deteriorated to require a rerun election.

■ The company's particular allegation in this case is that laboratory conditions were destroyed by activities of union agents and supporters that created a climate of fear and coercion. In cases involving allegations of pro-union coercion, a court will overturn the Board's decision to certify the victorious union only where the activities of union supporters created "an atmosphere of fear and coercion which made a free and fair election impossible." *Daylight Grocery Co. v. NLRB*, 678 F.2d 905, 909 (11th Cir.1982); *accord Tuf-Flex Glass v. NLRB*, 715 F.2d 291, 296 (7th Cir.1983); *NLRB v. Advanced Systems, Inc.*, 681 F.2d 570, 575 (9th Cir.1982); *Beaird-Poulan Division, Emerson Electric Co. v. NLRB*, 649 F.2d 589, 594 (8th Cir.1981) (*citing NLRB v. Griffith Oldsmobile, Inc.*, 455 F.2d 867, 870 (8th Cir.1972)). In controlling and overseeing representation elections, the Board enjoys great discretion. *See Amalgamated Clothing Workers of America v. NLRB*, 424 F.2d 818, 826–828 (D.C.Cir.1970).

There are a number of reasons, however, why the Board has particularly broad discretion in making the kind of decision under review here: the decision whether employees' free choice was so attenuated that a rerun election is necessary. The Board's conclusion concerning the level of coercion present in the "atmosphere" of a plant at the time of an election is the kind of delicate, fact-based determination that can be made only after careful weighing of all of the evidence. Because the Board is much closer to the facts than we as an appellate court can possibly be, our review of the Board's conclusions is limited. *See* 29 U.S.C. § 160(e) (1982) ("The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive."); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Conair Corp. v. NLRB*, 721 F.2d 1355, 1367–1368 (D.C.Cir.1983). In this case, for instance, a Hearing Officer

held a two-day hearing in which representatives of the company, union officials, and factory employees testified. The Hearing Officer was uniquely well-placed to draw conclusions about credibility when testimony was in conflict, and he was also far better situated than are we to draw conclusions about a matter as ephemeral as the emotional climate of the plant at the time of the election. *See, e.g., Tuf-Flex Glass, supra,* 715 F.2d at 295 (Hearing Officer's credibility determinations "may not be overturned absent the most extraordinary circumstances such as utter disregard for sworn testimony or the acceptance of testimony which is on its fact incredible"); *Beaird-Poulan Division, supra,* 649 F.2d at 592 n. 2; *Certain-Teed Products Corp. v. NLRB,* 562 F.2d 500, 505 (7th Cir.1977). The Hearing Officer's conclusions were fully endorsed by the Board, and we are extremely reluctant to second-guess these conclusions based on our reading—two years later—of a cold record. *See Worley Mills, Inc. v. NLRB,* 685 F.2d 362, 364 (10th Cir.1982).

■ Equally important in counseling deference to Board decisions in cases of this kind is the fact that the Board's particular expertise qualifies it—rather than the courts—to decide whether to call for a rerun election. *Cf. Conair Corp., supra,* 721 F.2d at 1373. The representation election process under the NLRA is not an abstract exercise in achieving ideal conditions; it is rather an intensely practical process designed to maximize employee free choice under the very real constraints and conditions that exist in the nation's workplaces. One of these constraints is the fact that delay itself almost inevitably works to the benefit of the employer and may frustrate the majority's right to choose to be represented by a union; forcing a rerun election may play into the hands of employers who capitalize on the delay to frustrate their employees' rights to organize. *See* Weiler, *Promises to Keep: Securing Workers' Rights to Self-Organization Under the NLRA,* 96 HARV.L.REV. 1769, 1793–1795 (1983); Roomkin & Block, *Case Processing Time and the Outcome of Representation Elections: Some Empirical Evidence,* 1981 U.ILL.L.REV. 75, 88–97 [2]; *see also St. Francis Federation of Nurses & Health Professionals v. NLRB,* 729 F.2d 844, 857 (D.C.Cir.1984). The inevitable defects in the original election will thus have to be weighed against the possible threats to employee free choice that a rerun election will entail; although neither the original election nor the rerun election may achieve an ideal of absolute free choice, one possibility or the other may still ensure the greatest possible free choice in a particular plant at a particular time. In carrying out the NLRA's goal of ensuring employee free choice, the Board must therefore consider carefully not only the circumstances surrounding the original election, but also the likelihood that a rerun election would more effectively advance employee free choice.

Given that the decision whether to overturn an election requires a delicate balancing of two alternatives, the Board is far more qualified to make the judgments involved than are the courts. First, the Board will have to assess the actual impact of a rerun election—with its attendant delays—on the employees' ability to make a

---

**2.** The article by Professors Roomkin and Block is particularly instructive. They begin by noting the "conventional wisdom" that "the passage of time makes it more difficult for the union to retain the loyalties of workers because delay gives employers added opportunity to dissuade employees and increases the likelihood of turnover in the workforce." *Id.* at 76. They recognize that, until the time of their study, "little published material provide[d] convincing ·evidence that lawyers and other consultants advise their clients in representation proceedings to stall intentionally." *Id.* But "the effectiveness of this tactic remains a widely accepted part of industrial relations folklore." *Id.* at 76–77. They assert that lobbying efforts on Capitol Hill by both business and labor "resulted in part from [the recognition by the business and labor communities] that time had strategic importance in election cases." *Id.* at 77. The purpose of their study was thus to provide empirical support or refutation of this widely held belief. There is no doubt that the result of their careful study of newly-available administrative records of the NLRB (*see id.* at 77) strongly supports the proposition that delays in the election representation process work in favor of the employer and against the union.

free choice. The Board is better able than are we to make such judgments about practical impact on a particular workplace; indeed; such judgments are closely akin to the kinds of questions of fact whose resolution the NLRA commits to the agency. *See* 29 U.S.C. § 160(e). Second, the Board will have to make the comparative judgment whether, given the likely practical impact of a rerun election in a particular plant at a particular time, such a rerun election would be a more genuine expression of employee free choice than was the original election. Even if we felt comfortable in making the fact-based prediction about the actual impact of a rerun election, we would still be reluctant to substitute our judgment for the Board's as to whether the original election or a rerun election will more likely be an expression of employee free choice.[3] Our review under the NLRA commits such comparative judgments to the Board. *Universal Camera Corp., supra,* 340 U.S. at 488, 71 S.Ct. at 465 (reviewing court may not "displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo* "). In short, the Board's expertise makes it better able than are the courts to gauge the extent to which holding a rerun election, which at first blush appears to merely maintain the status quo, actually operates to deprive employees of rights guaranteed by the NLRA.[4]

■ For these reasons, the scope of our review of the Board's decisions in cases involving certification is extremely limited. *See Amalgamated Clothing Workers, supra,* 424 F.2d at 827. If the Board has followed appropriate and fair procedures, and if the Board has reached a rational conclusion concerning whether the atmosphere surrounding the election so attenuated free choice that a rerun election was necessary, we will not presume ourselves—occupying a vantage point remote in time and place from the election at issue—to be better able than the Board to assess the impact of alleged instances of misconduct on an election.

B. *Applying the Legal Standards*

■ The company objects that a number of incidents that occurred prior to the election, taken singly or collectively, created an atmosphere of fear and coercion. It is useful briefly to go over the incidents.

1. *Threats made by union supporters.* The company claims that on two occasions pro-union employees threatened anti-union employees.

(a) *The Ball incident.* In the first incident Joyce Wilson, an election observer for the company, overheard Mike Ball, a pro-union employee, talking "about the cars being torn up by the union people against the people that were anti-union" and stating that "people could be hurt." App. 128. The Hearing Officer found that the comment was a part of a conversation among pro-union employees, and was neither directed at nor intended to be taken as threatening anti-union workers. Moreover, he found that there was no evidence that

---

3. The concurring opinion suggests that delay may often work in favor of the union. We are unaware of any data supporting this conclusion. Nonetheless, if (contrary to the conclusions of Professor Weiler and Professors Roomkin and Block) delay in fact operated in a significant number of cases to frustrate employees' anti-union desires, it would provide all the more reason to defer to Board decisions not to order rerun elections. To the extent that delay works against employee free choice—regardless whether it benefits the union or the employer—the Board has the expertise to gauge this effect and act accordingly in deciding whether to hold a rerun election.

4. We wish to make clear that our discussion of delay ought not be taken as a rebuke to the employer in this case; we have no reason to believe that the employer here did anything other than vigorously press its position before the agency and in this court. Rather, our discussion is aimed at understanding the regulatory landscape in which the Board makes decisions of the type under review today. Our conclusion is simply that, because the Board's decision whether to order a rerun election is a comparative judgment concerning the likely effects of delay versus the likelihood of a "cleaner" rerun election, particular deference must be given to the Board's decision.

the incident was widely known among the workers in the plant; Wilson testified only that she told her supervisor about it.

The Hearing Officer concluded that this comment did not "taint[ ] the atmosphere." App. 15. We fully agree that a comment of this type could easily have had little effect on the hard-fought election campaign. The evidence presented to the Hearing Officer showed that the company had frequently posted photographs and descriptions of strike violence on the canteen bulletin board. *See* App. 253–257. The conversation in question, which took place in the canteen where the company's bulletin board was located, could easily have been a discussion of the problem that the company itself clearly wanted to bring to the employees' attention. As such, it would be irrelevant to the inquiry as to whether the union and its supporters had created an atmosphere of fear and coercion in the plant.

The company suggests that this incident should be taken considerably more seriously because, according to it, Ball himself was a member of the In-Plant Organizing Committee (IPOC), a group of pro-union employees who supported the organizing campaign. The company argues that misconduct by union agents is generally counted more heavily in determining whether an election was valid than misconduct committed by mere supporters of the union. *See, e.g., ARA Services, Inc., supra,* 717 F.2d at 66; *Beaird-Poulan Division, supra,* 649 F.2d at 594; *Orleans Mfg. Co.,* 120 NLRB 630, 633–634 (1958). According to the company, members of the IPOC were union agents, and Ball's threat should therefore be given a great deal of weight in evaluating the election.

The Hearing Officer found that members of the IPOC were not agents of the union. App. 7. He found that members of the IPOC drafted, endorsed, and distributed leaflets, solicited employees to join the union, wore pro-union insignia, and even made visits to the homes of fellow employees to urge them to support the union. But none of the IPOC members held official positions

with the union, received formal training or instruction from the union, or were paid by the union for their work on the campaign. Moreover, there is no evidence that the union had knowledge of or in any way affirmed Ball's remark. *See Tuf-Flex Glass, supra,* 715 F.2d at 196. The Hearing Officer therefore found that the IPOC members (and Ball in particular) were not union agents.

We hold that the Hearing Officer appropriately found that the union was not responsible for the actions of workers over whom the union has no effective control. One of the reasons that misconduct by union agents is considered more serious than the same misconduct by mere supporters is that the union can exercise considerable control over its own personnel and can—by providing formal training and field experience to those with whom it is permanently associated or over whom it exercises control—see to it that they are familiar with at least some of the niceties of labor doctrine. To hold that the IPOC members were union agents would be in effect to penalize the union for conduct that it has little or no power to prevent. Moreover, it is well settled that employees are less likely to be coerced by the conduct of fellow employees than by the threats of outsiders who wield the full powers of the union. *See, e.g., ARA Services, Inc., supra,* 717 F.2d at 66. Employees have the ability, "from experience in the workplace, to give appropriate weight to possibly impulsive statements of fellow employees in the heat of a campaign." *Id.* Thus, even if Ball's statements were understood to be threatening, his fellow employees would presumably realize that the statements were mere reflections of the "temper and passion" of the moment. *Id.* For these reasons, we agree with the Board's conclusion that Ball was not a union agent.

To bolster its argument the company relies heavily on *PPG Industries, Inc. v. NLRB,* 671 F.2d 817 (4th Cir:1982); *see* brief for petitioner in No. 83–1369 at 15, 16, 18. Over the strong objections voiced by the Board's Hearing Officer in that case,

*see* 671 F.2d at 820–821 n. 5, the *PPG* court held that the IPOC members in the factual circumstances of that case were union agents. The court found conclusive "the telling force of the shoe-on-the-other-foot argument." *Id.* at 821 n. 6. The court argued that, had the IPOC members performed the same activities for the company instead of the union, they would clearly have been *company* agents; the court felt that this compelled a conclusion that the actual IPOC members should be held to be *union* agents. The company in the instant case argues that we should adopt the *PPG* court's reasoning which would inevitably lead, according to the company, to a holding that Ball was a union agent.

We believe that, because the company and the union are situated somewhat differently with respect to their relationship to the employees in a given plant, facially similar conduct by company and union may lead to quite different results when deciding whether an employee is a company or union agent. For instance, in *PPG* the union organizer asked IPOC members to be the union's "eyes and ears" in the plant. 671 F.2d at 819. If a manager of the company had made a similar request to an employee, it may have tended to support a finding that the employee had become a company agent, because the company is by definition present at the plant at all times and in the ordinary course does not need "eyes and ears" in the plant; the request could thus only be interpreted to mean that the company was commissioning the employee for particularly special service. The union, on the other hand, is restricted in its access to the plant and therefore may have to rely on employees to inform it, for example, of unfair labor practices committed by

the employer. This example does not of course demonstrate that the "shoe on the other foot" argument is always invalid in this context. But we believe that its validity should not be assumed absent a more discerning inquiry into the significance of the various aspects of the relationship between the union and the IPOC.

In short, although there may have been evidence pointing in both directions on the agency issue, we are satisfied that in this case the Board drew a reasonable conclusion.[5] *See Worley Mills, Inc., supra,* 685 F.2d at 366 (determination of essentially factual agency issue is for Board, not courts). It represents a reasonable evaluation of the control the union was able to exert over the IPOC, as well as a plausible policy judgment concerning the extent to which the union ought to be held responsible for IPOC members' conduct.

There is one more reason why the company's argument concerning the Ball incident must be rejected. As the Eighth Circuit has recently noted, excessive attention to the agency issue can divert attention from the central issue at stake: "whether threats, by whomever made, created a coercive environment." *NLRB v. Monark Boat Co.,* 713 F.2d 355, 360 (8th Cir.1983). The relationship between a union and its supporters can be too complex to permit conclusory labels of "agent" or "nonagent" to be useful analytic tools. In such cases the crucial issue is the effect of a given incident on the atmosphere within the plant; regardless of the label to be attached to Ball, we are satisfied that, with respect to this underlying question, the Hearing Officer reached an appropriate result.

**5.** It is worth noting that the agency determination may also involve important consequences for labor policy, and deference to the Board's decision is therefore all the more important. If, for instance, a court holds that IPOC members are union agents when the union has no other full-time organizer at the plant site, the effect will likely be that unions will be forced to see to it that they *do* have full-time organizers at each plant during representation campaigns: A union that did not put a full-time organizer at a given

site would lay itself open to the possibility that the plant's IPOC members—who are likely not to be familiar with the technicalities of labor law and over whom the union may have no effective control—will violate election rules and thus give the employer grounds for requiring rerun elections. Because requiring unions in this way to have full-time organizers present during each election campaign raises serious questions of labor policy, it is an issue that is for the Board, not the courts, to settle.

(b) *The Conley incident.* An anti-union employee, Harold Conley, was allegedly threatened on or near election day. Sharply conflicting evidence was presented concerning most aspects of the alleged threat, but the Hearing Officer found that a pro-union employee told Conley that, if Conley did not vote for the union, he would kill Conley and "[drink] up all of his liquor." App. 15. The Hearing Officer also found, however, that this statement was made in jest. He based his finding on the reference to the liquor and testimony that Conley's nickname ("Half Pint") was well known around the plant as a humorous reference to his drinking proclivities. In addition, the Hearing Officer relied on (disputed) testimony that Conley and the three other employees present all laughed when the statement was made.

We have no trouble accepting the Hearing Officer's findings. The testimony was in conflict, and the Hearing Officer, who had the opportunity to observe the witnesses and question them himself, chose to credit one version of the incident. *See Keokuk Gas Service Co. v. NLRB,* 580 F.2d 328, 334 (8th Cir.1978); *Abbott Laboratories, Ross Laboratories Division v. NLRB,* 540 F.2d 662, 666–667 (4th Cir. 1976); *cf. Worley Mills, Inc., supra,* 685 F.2d at 368 (joking threat will not upset election result); *Federal-Mogul Corp. v. NLRB,* 566 F.2d 1245, 1253 (5th Cir.1978) (same); *NLRB v. Bostik Division, USM Corp.,* 517 F.2d 971, 973–974 (6th Cir.1975) (same).

2. *Anonymous threats and incidents of vandalism.*

(a) *Pre-petition threats.* Evidence showed that a number of anti-union employees received anonymous threatening phone calls. First, a former employee who was married to a current employee received three phone calls prior to the time the petition for an election was filed. The first caller told her that "people who have big fine cars and big fine homes are going to be sorry that they don't join the Union." App. 7. Details of the second phone call are not in the record, but the third caller stated that he "had 5 sticks of dynamite for [the recipient's] house and 3 stick's for [a supervisor at a neighboring plant]." App. 7. In another incident anti-union employee Robert Clark received a telephone call prior to the filing of the election petition. The caller stated that "something bad is liable to happen to your truck" unless Clark signed a union card. App. 174.

The Hearing Officer properly found that none of these incidents could be considered in overturning the election, in accord with the rule stated in *Ideal Electric & Mfg. Co.,* 134 NLRB 1275 (1961); *see NLRB v. Claxton Poultry Co.,* 581 F.2d 1133, 1135 (5th Cir.1978) (*per curiam*), that an election will not be set aside based on conduct that occurred prior to the filing of the election petition. Absent extremely unusual circumstances, *see, e.g., Willis Shaw Frozen Food Express, Inc.,* 209 NLRB 267 (1974) (pre-petition conduct included numerous instances of stabbings, assaults, and shootings), the Board's rule is a convenient device to limit the inquiry to the period near the election when improper acts are most likely to affect the employees' freedom of choice. We therefore find reasonable the Hearing Officer's conclusion that these calls are insufficient to support a finding that the atmosphere was so poisoned at election time that free choice was impossible.

(b) *Incidents during the election campaign.* A second category of anonymous threats includes several threats made during the election campaign. Employee Robert Clark, who had been the recipient of one of the pre-petition calls, received another, similar phone call two weeks before the election. One week later he discovered a 12-inch scratch on his truck.

Minor acts of vandalism also were committed on the cars of several other employees. One employee—while cleaning her car at home five days after the election—discovered a "big X" scratched on the hood of her car and small cuts on two tires. Another employee testified that sometime around the election he discovered a "few

scratches" and a large piece of chewing gum on the front fender of his car. A third employee discovered a seven-inch and a three-inch scratch on his car approximately six weeks before the election. Finally, a fourth employee found a six-inch-long mark apparently made by a shoe on his car, and then found "little pinstripes" evidently made by a knife on the top of his door.

There may have been one other anonymous incident. Employee Keith Hoyle, a leader of the anti-union employees, claimed that Woodrow Rose, another employee, had received two telephone calls threatening him with bodily harm if he did not sign a union card. Rose himself did not testify, and the Hearing Officer gave little weight to the phone calls, evidence of which was pure hearsay and the exact content and date of which remained unknown.

The complained-of incidents fall into two categories. In the first category are the anonymous phone calls made to Clark and (to the extent it is credited) Rose. Each of these incidents on its face was at least related to the election. Yet none can be traced to specific union agents or union supporters. Two factors militate against over-valuing them in deciding the need for a rerun election. First, the union may well have had no way to prevent such incidents from occurring; a rerun election would merely risk futility, because such incidents could easily recur despite the best efforts of the union and its supporters. Second, ordering a rerun election on the basis of anonymous incidents can be devastatingly unfair to the majority of employees who have voted for the union; an unscrupulous employer could encourage anonymous prounion incidents in order to give it grounds for use later to reverse the election result if it loses. *See Bush Hog, Inc., supra,* 420 F.2d at 1269 ("Any other rule would invite third parties or one of the protagonists who doubted the election outcome to anonymously create incidents and then attempt to use them to set aside the election.") Recent commentators have suggested that delay itself is a tactic that is frequently used against the union (and against the exercise of genuine free choice by employ-

ees), *see* Weiler, *supra,* 96 Harv.L.Rev. at 1776–1797, and fears that employers would deliberately provoke or arrange for anonymous incidents thus cannot be ignored. Although we do not of course impute any such intentional conduct to the employer here, the possibility of this kind of abuse should make courts extremely wary when reviewing Board decisions certifying election results. For these reasons, the Board's decision not to overturn the election based on these anonymous incidents seems to us to be well within its discretion. *Cf., e.g., Daylight Grocery Co., supra,* 678 F.2d at 909 (stating that to overturn elections on the basis of such incidents would "merely encourage anonymously created incidents").

The second category of incidents involves the minor acts of vandalism committed on employees' cars in the open parking lot. We have already noted that misconduct by known third parties is to be given less weight than misconduct by union agents. Anonymous incidents that are unambiguously related to the election are to be given still less weight. It follows that anonymous conduct that may not even be related to the union, the plant, or the election at all deserves even less weight. The same reasons that argue for caution in evaluating anonymous pro-union acts counsel even more care in evaluating anonymous acts that may have nothing to do with the election. *See Bush Hog, Inc., supra,* 420 F.2d at 1269; *NLRB v. Spring Road Corp.,* 577 F.2d 586, 588 (9th Cir.1978). Acts of vandalism occur with alarming frequency in our society—even in factory parking lots. Given the difficulties that police departments have in controlling vandalism generally, it would hardly be fair to require the union and its supporters to keep a community free of vandalism while a representation election is going on. At any rate, the law is well settled that such minor incidents of property damage are insufficient to overturn an election. *See, e.g., NLRB v. Belcor, Inc.,* 652 F.2d 856, 861 (9th Cir. 1981); *Beaird-Poulan Division, supra,* 649 F.2d at 592–593; *Bostik Division,*

USM Corp., supra, 517 F.2d at 974; *NLRB v. Monroe Auto Equipment*, 470 F.2d 1329, 1332 (5th Cir.1972), *cert. denied*, 412 U.S. 928, 93 S.Ct. 2752, 37 L.Ed.2d 155 (1973). We therefore conclude that the Board appropriately exercised its judgment in deciding that none of the enumerated incidents were sufficient to require a rerun election.

3. *Totality of the circumstances.* Putting aside the pre-petition conduct, we are left with one overheard conversation that could have been interpreted to contain a threat, one threat made in jest by a union supporter, one anonymous phone call threatening damage to an employee's car followed by a minor act of vandalism committed on that car, one other anonymous threat of indeterminate date and content, and four minor acts of vandalism. The company argues, however, that even if these incidents taken singly were insufficient to demonstrate that an atmosphere of coercion had taken hold of the plant at the time of the election, the Board committed error by improperly evaluating the *cumulative* effect of the incidents. *See NLRB v. Van Gorp Corp.*, 615 F.2d 759, 764–765 (8th Cir.1980). *But see id.* at 765 ("While we emphasize the need to consider the overall conduct of an election campaign, we caution that such an approach may not be used to turn a number of insubstantial objections to an election into a serious challenge.").

The company's argument is misplaced because its misconceives the purpose of reviewing specific incidents in an election campaign. The purpose of the Board's inquiry (and of the review we have conducted above) is not to determine if any single incident taken alone requires overturning the election results; it will be a rare case indeed in which a single incident is that significant. Rather, the Board reviews the specific incidents using the rules of thumb discussed above—ignore pre-petition conduct, count misconduct by union or company agents heavily, weigh anonymous conduct lightly, etc.—as guides to assist in making the difficult overall judgment as to whether the atmosphere in the plant at the time of the election was so poisoned that free choice was impossible. If these rules of thumb place most or all of the incidents in the least weighty categories, the Board appropriately will decide not to overturn the election results. In this case the Hearing Officer made exactly this inquiry, recommending that the union be certified, and the Board adopted his findings.

To be sure, the election at issue here was flawed when viewed against the "laboratory conditions" ideal. And the election result was quite close: if the challenges to ballots were all decided against the union, a one-vote swing out of 200 votes cast could have changed the results. *Cf. Beaird-Poulan Division, supra*, 649 F.2d at 591 (vote was 402–383 plus 10 challenged ballots; five-vote swing out of 795 could have changed result); *Fidelity Telephone Co. v. NLRB*, 574 F.2d 409, 410 (8th Cir.1978) (vote was 30–25 plus 3 challenged ballots; one-vote swing out of 58 could have changed result); *Bostik Division, USM Corp., supra*, 517 F.2d at 972 (vote was 60–54 plus three challenged ballots; two-vote swing out of 117 could have changed result). But requiring a rerun election runs the risk of a repetition of exactly the same incidents while reaching exactly the same result. Meanwhile, the delay engendered may itself operate against the right of employees ultimately to exercise their free choice. *See generally* Weiler, *supra.* Moreover, should the union once again win the rerun election, it will nonetheless have had the untoward consequence of delaying vindication of the employees' right to organize. The Board thus had to make delicate judgments weighing any possible infringements of free choice against the dangers of delay and the possibility of an equally flawed rerun election. Because we are disinclined to second-guess the Board when it makes the kinds of "totality of the circumstances" and balancing judgments required in this kind of case, our review is narrow: if the Board has followed fair procedures, has evaluated the evidence on the basis of the kinds of reasonable rules discussed above, and has reached a conclu-

sion that is reasonable given that evaluation, we may not substitute our judgment as to the ultimate result for that of the Board. In particular, we will not independently assess the "totality of the circumstances" to overturn the Board's considered decisions.

## II. REMEDIES

As a remedy the Board ordered the company to cease and desist from committing unfair labor practices and to begin bargaining with the union upon request. The Board's order evidently requires the company to supply the union with the information to which it is entitled in order effectively to bargain on behalf of the employees. In ordering this remedy the Board rejected the union's request for so-called "make whole" remedies: a bargaining order retroactive to the date of the election, establishment of an "interim" grievance procedure for use by employees until a collectively-negotiated procedure could be set in place, litigation expenses, and attorney fees. The union here petitions the court to reverse the Board's order denying the requested remedies.

We need not dwell on this aspect of the case, for the Board's discretion in the area of remedies is great, see *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 215–216, 85 S.Ct. 398, 405–406, 13 L.Ed.2d 233 (1964); *Amalgamated Clothing Workers, supra*, 424 F.2d at 830; *Amalgamated Clothing Workers of America v. NLRB*, 371 F.2d 740, 746 (D.C.Cir. 1966). In particular, the Board will only issue a retroactive bargaining order when the employer has unilaterally changed the terms and conditions of employment after it has committed unfair labor practices, *Beasley Energy Inc.*, 228 NLRB 93, 95 n. 9 (1977); *see NLRB v. Eagle Material Handling, Inc.*, 558 F.2d 160, 166–168 (3d Cir. 1977); in this case no such charges have been made. Similarly, the Board acts reasonably in denying attorney fees and litigation expenses unless the employer has acted in bad faith in asserting non-debatable defenses in order to drag out the proceed-

ings, *see NLRB v. Food Store Employees Union*, 417 U.S. 1, 8–9, 94 S.Ct. 2074, 2079–2080, 40 L.Ed.2d 612 (1974); in this case we agree with the Board that the employer's defenses to its duty to bargain—though inadequate—are at least debatable. Finally, the Board certainly had the discretion to decide that imposing the union's requested "interim" grievance procedure outside of a collective bargaining agreement was not necessary (or perhaps even desirable) to advance the purposes of the NLRA in this case. We therefore affirm the Board's denial of the union's requested "make whole" remedies.

## III. CONCLUSION

We do not review Board certification decisions in a vacuum in which the only consideration is the existence of ideal "laboratory conditions" and in which the status quo in the plant can be effectively frozen for several years while a new election is held (and subsequent appeals are taken). Rather, our review of Board certification decisions must be responsive to the Board's recognition of the "real world" conditions in which elections are held. In fact, we confess to a feeling of dissatisfaction with the fact that today—more than two and a half years after the election of July 1, 1981 at Lowenstein's Morganton plant—bargaining has yet to commence and the employees' right to organize has yet to be fully vindicated. We therefore decline to extend the delay—and the consequent erosion of employees' rights—by requiring the Board to conduct a rerun election in the hope that we are better able than the Board to predict that such an election will more accurately reflect an ideal of absolute free choice.

We therefore enforce the Board's order in all respects.

*So ordered.*

BORK, Circuit Judge, concurring:

I concur in the judgment and I agree with most of what is said in the majority opinion. I decline to join the opinion, how-

ever, because I am uncomfortable with its overall tone as well as with a number of observations scattered throughout the opinion which seem unnecessary to the result. A prime example is the majority's discussion of delay as an employer tactic. The majority states that "delay itself almost inevitably works to the benefit of the employer." [1] Maj. op. at 1563. *See also* maj. op. at 1564, 1568 & 1569. It is not clear to me that the delay of a rerun election may not be a union tactic as well. A union may believe that the delay will enable it to gain strength. In any event, the employer in this case has not been accused of acting improperly for the purposes of delay and the majority does not suggest that in objecting to the election results the employer acted unlawfully or in bad faith. This discussion is inappropriate in the context of this case—which involves allegations of unlawful *pro-union* conduct. There is no need to justify the deference courts owe to the NLRB in cases such as this one by reference to the adverse effects of delay on employee free choice. Here, the Board upheld the Hearing Officer's findings that the atmosphere at the plant was not so infected by employee conduct that a rerun election should be ordered. Maj. op. at 1561–1562. This is a reasonable finding and we owe it deference. The comments about the inevitable effects of delay are superfluous and one-sided.

This one-sided view of the effects of delay means that employee free choice will be identified with union victories. That false

identification will mean that the Board should consider the likelihood that a union will win again in deciding whether to order a rerun election. Maj. op. at 1563–1564 & 1564. I am pleased that the clear thrust of this reasoning is somewhat blunted, though perhaps illogically, by footnote 2.

Finally, in agreeing with the Board's conclusion that Mr. Ball was not a union agent the majority reaches out to reject the Fourth Circuit's use of the "shoe-on-the-other-foot argument" in *PPG Industries, Inc. v. NLRB*, 671 F.2d 817 (4th Cir.1982). I am not at all sure that I would join in the majority's criticism of that case were it necessary for us to decide whether to apply it here. We need not make a pronouncement on every case cited to us by a party merely because it is said to be controlling. In this case, even were we to adopt the *PPG* court's reasoning, we would not inevitably hold that Ball was a union agent. As it is, the majority not only needlessly criticizes another Circuit, it also posits and decides a hypothetical case. Moreover, the majority's analysis of that hypothetical is flawed. It does not follow that every time a manager asks an employee to be the "eyes and ears" of management "the request could ... only be interpreted to mean that the company was commissioning the employee for particularly special service." Maj. op. at 1566. This conclusion rests on the assumption, which seems to me quite artificial, that it is reasonable in every case to assume that the company is "by defini-

---

**1.** This proposition, which is repeated several times in the majority opinion, is chiefly supported by repeated citations to a single law review article whose arguments are highly partisan and controversial. For example, the assumption on which the article is predicated is that "[a] major factor in [the] decline [of collective bargaining] has been the skyrocketing use of coercive and illegal tactics ... by employers determined to prevent unionization of their employees." Weiler, *Promises to Keep: Securing Workers' Rights to Self-Organization Under the NLRA*, 96 Harv.L.Rev. 1769, 1769–70 (1983). While I trust the majority does not regard that view as axiomatic, it does seem to me that the majority should be more wary of conclusions that flow from a premise so dubious.

The second article cited by the majority, Roomkin & Block, *Case Processing Time and the Outcome of Representation Elections: Some Empirical Evidence*, 1981 U.Ill.L.Rev. 75, acknowledges that until the publication of their article "little published material provide[d] convincing evidence that lawyers and other consultants advise their clients in representation elections to stall intentionally," although "industrial relations folklore" accepts the "effectiveness of this tactic." *Id.* at 76. Also, Professors Roomkin and Block are much less sure of the "inevitable" effects of delay than is the majority; according to them, their data suggests that delay "appears to increase the likelihood of the employer winning." *Id.* at 95. Finally, the Roomkin and Block study does not consider the effects of delay on rerun elections.

tion" present in the plant at all times. That case is not before us; there are no allegations here about any company agents. The majority would have done better, in my view, to have confined its discussion to the Board's findings without ranging far afield to lay down controversial but irrelevant principles and to decide hypothetical cases.