999 F.2d 1268
 143 L.R.R.M. (BNA) 2956, 62 USLW 2116,
125 Lab.Cas. P 10,782
 NATIONAL LABOR RELATIONS BOARD, Petitioner.
Southwest Regional Joint Board, Amalgamated Clothing and
Textile Workers Union, AFL-CIO, CLC, Intervenor,
v.
EARLE INDUSTRIES, INC., Respondent.
 No. 92-3228.
 United States Court of Appeals,
Eighth Circuit.
 Submitted April 12, 1993.
Decided July 28, 1993.
 
 Lisa Richardson, N.L.R.B., Washington, DC, argued, for petitioner.
 Jeff Weintraub, Memphis, TN, argued, for respondent.
 Before WOLLMAN and MORRIS SHEPPARD ARNOLD, Circuit Judges, and STOHR,* District Judge.
 WOLLMAN, Circuit Judge.
 
 
 1
 The National Labor Relations Board applies for enforcement of its decision and order against Earle Industries, Inc. We affirm the Board's decision and enforce its order.
 
 I.
 
 2
 Earle Industries is a corporation engaged in the manufacture of closet accessories in Earle, Arkansas. On October 25, 1991, the Board conducted a representation election among Earle Industries' employees to determine whether the employees desired to be represented by the Amalgamated Clothing and Textile Workers Union, Southwest Regional Joint Board (the union). The election resulted in 165 votes in favor of representation by the union, 131 votes against, and 14 non-determinative challenged ballots.
 
 
 3
 Earle Industries filed objections to the election, alleging that the union had interfered with the election by "[c]reating a climate of fear and coercion" through the activities of the Reverend Jesse Jackson and other union agents and supporters at Earle Industries' plant on October 1 and October 24, 1991.
 
 
 4
 The circumstances surrounding the two incidents alleged by Earle Industries to have interfered with the election were found by the Board to be as follows.
 
 
 5
 At approximately 11:30 a.m. on October 1, 1991, during the employees' lunch period, some employees began distributing union buttons to a large group of employees gathered in Earle Industries' parking lot. Shortly thereafter, Reverend Jackson, accompanied by union representatives and members of the media, arrived at the parking lot. Reverend Jackson was greeted by cheering and opened the rally with a prayer. A few minutes later, Michael Holdway, a union representative, drove a flatbed truck into the parking lot. Reverend Jackson then mounted the truck and began speaking through a microphone to the group of employees concerning the benefits of unionization.
 
 
 6
 At the request of Gary Smith, Earle Industries' personnel manager, the Earle police informed the union representatives, Reverend Jackson, and the members of his group that they were trespassing and would have to leave the premises. The police also told union representative Duane Stillwell and two other men that they were trespassing and that they would have to move the truck off Earle Industries' property. One of the men indicated that Reverend Jackson was almost finished with his speech. Smith reiterated his demand, and Earle Police Chief Greg Martin told Stillwell and the other two men that they had thirty seconds to shut down the sound equipment and leave the property.
 
 
 7
 When the union representatives failed to respond to the police request within the designated time, the police officers shut down the sound system, cutting off Reverend Jackson's speech. Reverend Jackson attempted to continue his speech, but had difficulty making himself heard over the crowd's ambient noise. At the same time, Stillwell removed the keys from the truck, whereupon the officers arrested him and Holdway, the driver, for trespassing. The police then drove the truck off Earle Industries' property, with Reverend Jackson and various other union supporters still aboard. Reverend Jackson dismounted from the truck, and, along with a number of employees, returned to the property. A short time later, Reverend Jackson went over to the police car in which Stillwell and Holdway remained handcuffed in the back seat. Reverend Jackson informed the arrested officials that he was going to enter the plant to persuade the owner to drop the charges. In all, the truck was on the premises for some fifteen or twenty minutes.
 
 
 8
 Shortly before noon, Reverend Jackson, accompanied by some employees and members of the media, entered the plant through the employee entrance. They walked through a passageway that led to the front administrative offices. Before they reached the door leading into the foyer of the front offices, the group was intercepted by Smith. Reverend Jackson, surmising that Smith was in fact Peter Felsenthal, Earle Industries' senior vice-president, shook hands with Smith. Upon learning that Smith was not Felsenthal, Reverend Jackson requested an audience with Felsenthal. Smith informed Reverend Jackson that he was trespassing, and repeatedly asked him to leave the plant through the employee entrance and re-enter through the front entrance, designated for visitors. Reverend Jackson asked Smith to accompany him to the front entrance, but Smith declined. After reiterating his request that Reverend Jackson leave, Smith stated that he was not going to argue and retreated into the foyer and front office reception area, locking the door behind him.
 
 
 9
 Reverend Jackson and his group followed Smith, prompting cheers from some of the employees. Meanwhile, Smith proceeded to Felsenthal's office and informed him that Reverend Jackson was in the front foyer. Chief Martin informed Felsenthal that he, Felsenthal, would have to talk to Reverend Jackson or else Martin would arrest Reverend Jackson. Felsenthal agreed to meet with Reverend Jackson in his office, and Martin escorted Reverend Jackson into the office. The Board found that less than two minutes had elapsed from the time Reverend Jackson entered the plant to when he entered the front office. By this time, most of the employees had returned to their work stations.
 
 
 10
 The meeting, which included Reverend Jackson, Felsenthal, and Chief Martin, occurred in Felsenthal's office. During the meeting, Reverend Jackson told Felsenthal that he thought that Earle Industries' workers should organize and that he had visited the plant to assist them in their efforts. Reverend Jackson also encouraged Felsenthal to agree to October 25 as the date for an election. Felsenthal responded that he had already tentatively agreed to that date with the Board but had not yet announced it to the employees. Felsenthal agreed that Reverend Jackson could inform the news media that October 25 was the tentative date. Felsenthal and Reverend Jackson also discussed working conditions. In addition, Felsenthal informed Chief Martin that he did not intend to press charges against the two union officials who had been arrested.
 
 
 11
 Shortly after the meeting, Reverend Jackson held a three minute press conference in Earle Industries' parking lot, at which he discussed some of the history of organizing at Earle Industries and announced that Felsenthal had told him that he would recommend that the election be held on October 25. Reverend Jackson then left the property at approximately 1:00 p.m.
 
 
 12
 On October 24, the day before the election, based on rumors that Reverend Jackson would reappear, Earle Industries released employees at 2:30 p.m., an hour before their normal quitting time. By 3:00 p.m., most of the employees had vacated the premises, and the facility had been secured. At 3:15 p.m., Reverend Jackson and a group of his supporters arrived and parked on the shoulder of Highway 64, where they met briefly with union representatives and some employees. Reverend Jackson then walked across the highway toward the entry gate to the parking lot, where he was met by Smith outside the company's property. Reverend Jackson requested a meeting with Felsenthal, but Smith informed him that Felsenthal was working on election details. Smith told Reverend Jackson that Felsenthal would be happy to meet with him in neutral territory during the week following the election. Reverend Jackson replied that he would be glad to meet with Felsenthal in either Memphis or Washington, D.C., and would assist in any way possible after the election. Smith and Reverend Jackson shook hands, and Reverend Jackson walked back across the highway, where he joined some employees, supporters, and members of the media. The group then marched along Highway 64 and proceeded through the town of Earle to the Earle Garden Club where the group held a rally.
 
 
 13
 The Board's Regional Director conducted an investigation of Earle Industries' objections. On December 5, 1991, the Regional Director issued a report in which he recommended that the Board overrule the objections in their entirety and certify the union as the employees' bargaining representative. Earle Industries filed exceptions to the Regional Director's report.
 
 
 14
 On June 4, 1992, the Board issued its Decision and Certification of Representative, in which it adopted the Regional Director's findings and recommendations concerning Earle Industries' objections and certified the union as the unit employees' exclusive bargaining representative.
 
 
 15
 Earle Industries refused to bargain with the union. The union responded by filing an unfair labor practice charge with the Board. The Board's General Counsel issued a complaint alleging that Earle Industries had refused to bargain with the union, in violation of Sections 8(a)(1) and (5) of the National Labor Relations Act (the Act) (29 U.S.C. §§ 158(a)(1) and (a)(5)). Earle Industries admitted its refusal to bargain, but attacked the validity of the union's underlying certification, asserting that the Board had improperly overruled its objections to the election.
 
 
 16
 The Board's General Counsel filed a motion for summary judgment with the Board. The Board issued an order transferring the proceeding to itself and requiring Earle Industries to show cause why summary judgment should not be granted. Earle Industries did not file a response.
 
 
 17
 Thereafter, the Board issued its decision and order, granting the General Counsel's motion for summary judgment and finding that Earle Industries had violated sections 8(a)(1) and (5) of the Act by refusing to bargain with the union. The Board concluded that all of the issues raised by Earle Industries in the unfair labor practice proceeding were, or could have been, litigated in the underlying representation proceeding. The Board also found that Earle Industries did not offer to produce any newly discovered or previously unavailable evidence, nor did it allege the existence of any special circumstances requiring the Board to re-examine its decision in the representation proceeding.
 
 
 18
 The Board issued an order requiring Earle Industries to cease and desist from refusing to bargain with the union and from in any like or related manner interfering with, restraining, or coercing employees in the exercise of their section 7 (29 U.S.C. § 157) rights. Affirmatively, the Board's order directs Earle Industries to bargain with the union on request, to embody any understanding reached in a signed agreement, and to post an appended notice detailing the contents of the Board's order.
 
 II.
 
 19
 Earle Industries argues that the Board erred in overruling its objections to the election, in certifying the union, and in finding that it had violated Sections 8(a)(1) and (5) of the Act. Earle Industries contends that the union engaged in "critical period misconduct" that interfered with its employees' exercise of free choice so as to materially affect the election results. Because Earle Industries admittedly has refused to bargain with the union, unless it prevails in its challenge to the validity of the election, its refusal clearly violates Sections 8(a)(1) and (5) of the Act, and the Board's order is entitled to enforcement. See Technicolor Gov't Servs., Inc. v. NLRB, 739 F.2d 323, 326 (8th Cir.1984).
 
 
 20
 Earle Industries originally raised nine objections before the Board, six of which it reiterates to us. Objections One through Five concern the events of October 1, 1991. They state, essentially, that particular incidents, especially (1) the driving of the truck onto Earle Industries' premises; (2) the arrest of two union officials; (3) Reverend Jackson's unauthorized entry into the plant accompanied by unit employees; and (4) Reverend Jackson's confrontation with various Earle Industries management personnel, created "an atmosphere of fear and coercion and upset laboratory conditions." Objection Eight concerns the march and rally held on October 24, 1991, and claims that this conduct also "destroyed laboratory conditions." In support of its objections, Earle Industries submitted employee and management affidavits and statements, a videotape, and other documentary evidence.
 
 III.
 
 21
 We will enforce an order of the National Labor Relations Board if the Board has correctly applied the law and if substantial evidence in the record supports its findings. Radisson Plaza Minneapolis v. NLRB, 987 F.2d 1376, 1380 (8th Cir.1993); Litton Microwave Cooking Prods. v. NLRB, 949 F.2d 249, 251 (8th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1669, 118 L.Ed.2d 390 (1992).
 
 
 22
 "On review of the Board's certification determination, the standard is whether the Board reasonably exercised the 'wide degree of discretion vested in it by Congress regarding representation matters.' " NLRB v. Monark Boat Co., 800 F.2d 191, 193 (8th Cir.1986) (quoting Beaird-Poulan Div., Emerson Electric Co. v. NLRB, 649 F.2d 589, 592 (8th Cir.1981)). The party challenging the outcome of the election bears the heavy burden of "producing evidence sufficient to mandate a result different from that obtained through the casting of ballots." NLRB v. Krafcor Corp., 712 F.2d 1268, 1269 (8th Cir.1983). We require the objecting party to show "not only that improprieties occurred, but also that they interfered with employees' exercise of free choice to such an extent that they materially affected the election results." Beaird-Poulan Div., 649 F.2d at 592.
 
 
 23
 Where a party to the election is alleged to have engaged in conduct requiring the Board to overturn the election results, the Board judges the conduct by assessing whether it "reasonably tend[ed] to interfere with the employees' free and uncoerced choice in the election." Baja's Place, 268 N.L.R.B. 868, 868, 1984 WL 36040 (1984). The Board set forth in Avis Rent-A-Car Sys., 280 N.L.R.B. 580, 581, 1986 WL 53941 (1986), the factors it considers in determining whether conduct would reasonably have tended to interfere with employee choice. These factors include: the number of incidents of misconduct; the severity of the incidents and whether they were likely to cause fear among the employees in the bargaining unit; the proximity of the misconduct to the election date; and the closeness of the final vote.
 
 
 24
 In examining the Board's decision, we note first that the absence of threats or other intimidating misconduct significantly reduces the likelihood of misconduct interfering with employee free choice. Initially, as the Board found, the activities of October 1, 1991, both inside and outside the plant, were restrained in nature. Neither Reverend Jackson nor other union agents made any threats of violence against Earle Industries' management, employees, or property, either before or after Reverend Jackson entered the plant. The Board noted that Reverend Jackson's exchange with Smith was "quiet and civil."
 
 
 25
 Contrary to Earle Industries' assertions, the evidence does not show that employees erupted into a frenzy or near-riot. Rather, the evidence supports the Board's finding that most employees returned to their job stations on time at the end of the lunch period during which the rally occurred and that the few employees who returned late were tardy by only a few minutes. Manager Smith himself admitted that there were no threats or violence at any point during the union-sponsored activities.
 
 
 26
 Likewise, the lapse of time between the alleged incidents of misconduct and the election date is a factor that must be considered. See Wilkinson Mfg. Co. v. NLRB, 456 F.2d 298, 303-304 (8th Cir.1972); Station Operators, 307 N.L.R.B. No. 37, 1992 WL 90690 (Apr. 27, 1992) (that incident occurred two weeks before election and election was determined by wide margin were factors in finding that pre-election misconduct did not taint election). In addition to the non-threatening nature of the October 1 conduct by Reverend Jackson and the union representatives, we find it significant that this conduct occurred more than three weeks before the election.
 
 
 27
 The Board also considered the eventual vote margin of the election in determining the effect of any purported misconduct upon the outcome. Here, that the union prevailed in the election by thirty-four votes in a unit of 320 employees, a margin of more than ten percentage points, lends further support to the Board's conclusion that the events of October 1 did not materially affect the outcome. See Id.
 
 
 28
 The Board also concluded that the events of October 24 did not give rise to objectionable conduct sufficient to set aside the election. As the record shows, the events of October 24 were entirely peaceful. By the time Reverend Jackson arrived at the plant, most of the employees had left the premises. Unlike the October 1 incident, neither Reverend Jackson nor any union representatives entered Earle Industries' premises. The Board also found that the conversation between Smith and Reverend Jackson was "cordial and devoid of any threatening or coercive statements." Last, the Board found no evidence that any employee or manager was threatened, intimidated, or coerced by the October 24 assembly outside the plant and the subsequent march through the town of Earle.
 
 
 29
 Having addressed Earle Industries' objections under the Avis factors, we turn next to its reliance on Phillips Chrysler Plymouth, Inc., 304 N.L.R.B. 16, 1991 WL 160361 (1991), for support of its theory that the "test of wills" between Reverend Jackson and Smith created an atmosphere that coerced and intimidated unit employees into voting for the union. The Board distinguished Phillips from the facts in this case, and we agree with the substance of its analysis. In Phillips, two union organizers spoke to bargaining unit employees on the morning of the day of the election. Id. at 16. The company's president informed the organizers that they could not enter the shop area until the 9:00 a.m. pre-election conference and asked them to wait in the reception area until that time. Id. The union agents then engaged in a "shouting match" with the company's president, claiming that they had a right to be there and that the election would be jeopardized if they were removed, and refused to leave even after the company had called the police. Id. The Board set aside the election, finding that the incident had occurred in front of all ten unit employees in their work areas, that the union organizers had belligerently refused to follow the president's request to leave, and that such a "direct challenge to the Employer's assertion of its property rights could not have been lost on the employees as they began to vote 75 minutes later." Id. In addition, the Board found the conduct significant because the election had been decided by a single vote. Id.
 
 
 30
 The Board distinguished the incidents in this case, noting that no "shouting matches" occurred; that the conduct occurred several weeks before the election; and that the election was not decided by a single vote. Moreover, the Board found that, unlike the facts in Phillips, where union organizers had attempted to solicit employees' support in work areas during work time, Reverend Jackson had entered a non-work area in the plant briefly during non-work time to attempt to meet with Felsenthal. Accordingly, we agree with the Board that the union's conduct did not rise to the level of that in Phillips.
 
 
 31
 We conclude that Earle Industries has failed to bear its burden of showing that the Board's decision is not supported by substantial evidence on the record as a whole. Accordingly, we enforce the Board's order.[1]
 
 
 
 *
 The HONORABLE DONALD J. STOHR, United States District Judge for the Eastern District of Missouri, sitting by designation
 
 
 [1]
 We deny Earle Industries' motion to supplement the record on appeal or, in the alternative, to remand to the Board